# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

COYNE'S & COMPANY, INC.,
a Minnesota corporation,

                        Plaintiff,


v.                              **MEMORANDUM OF LAW & ORDER**
                                   Civil File No. 07-4095 (MJD/SRN)


ENESCO, LLC, an Illinois limited
liability company; COUNTRY
ARTISTS, LTD.; and MARK JEREMY
ORTON and ALLAN WATSON
GRAHAM, as Receivers of Country
Artists, Ltd.,

                        Defendants.

_____

Paul L. Ratelle and Thomas A. Forker, Fabyanske Westra Hart & Thomson, PA, Counsel for Plaintiff.

James V. Garvey, Vedder Price Kaufman & Kammholz, PC; Michael J. Steinlage and Kelly A. Swanson, Larson King, LLP, Counsel for Defendant Enesco, LLC.

_____

## I.    INTRODUCTION

    This matter is before the Court on Defendant Enesco, LLP's Motion to

Dismiss Plaintiff's Second Amended Complaint.  [Docket No. 56]  The Court

heard oral argument on February 29, 2008.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Parties

Plaintiff Coyne's & Company, Inc. ("Coyne's") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  (Second Amended Complaint ("Compl.") ¶ 2.)  Coyne's is a giftware company that has been in business for over 50 years.  (Id.)  It sells various product lines, including the Country Artists line manufactured by Defendant Country Artists, Ltd. ("CA").  (Id.)

Defendant CA has its principal place of business in England. (Compl. ¶ 3.) The company sells gift products.  (Id.)  CA has been in receivership since August 10, 2007.  (Id. ¶ 22.)  Defendants Mark Jeremy Orton ("Orton") and Allan Watson Graham ("Graham") are the appointed Receivers of the business assets for the benefit of creditor Lloyds TSB Bank plc.  (Id. ¶ 4.)

Defendant Enesco, LLC ("Enesco") is a U.S.-based company with its principal place of business in Illinois.  (Compl. ¶ 5.)  Enesco sells giftware and home and garden decor.  (Id.)  Coyne's and Enesco compete in the giftware

market.   (Id. ¶ 26.)

## 2.   Contracts

### a.   Distributor Agreement

#### i.   General Provisions

In August 2005, Coyne's and CA entered into a Distributor Agreement.

(Compl. ¶ 8; Distributor Agreement, Ex. A to Steinlage Aff.)  The interpretation of

the Distributor Agreement is governed by the laws of the United States and of the

State of Minnesota.  (Distributor Agreement § 12.4.)

In the Distributor Agreement, CA granted Coyne's

> the exclusive right to sell, distribute, market and advertise certain
> lines of COUNTRY ARTISTS product as described in Exhibit A to
> this agreement and in any derivative products (cumulatively, the
> "Products") for the term of this Agreement . . . for the territory
> consisting of the United States and Mexico (the "Territory") . . . .
> Subject to section 1.6 [permitting internet sales and sales outside the
> Territory], and otherwise as herein provided COUNTRY ARTISTS
> will not during the term of this Agreement either actively sell any
> Product to any person or entity other than COYNE'S within the
> Territory . . . without first obtaining the written consent of COYNE'S
> such consent not to be unreasonably withheld or delayed.

(Id. § 1.1.)

Additionally, the agreement provided that CA owns or has secured rights

in the "trade names, trade marks and copyrights associated with the Products."

3

(<u>Id.</u> § 7.1)  CA authorized Coyne's "to use the Trade Marks in the Territory in relation to the Products for the purposes only of exercising its rights and performing its obligations under this Agreement.  Such rights shall cease immediately upon termination of this Agreement, other than as is necessary to make sales pursuant to Section 5 or Section 6.2 hereof."  (<u>Id.</u> § 7.2.)

The Distributor Agreement provided it "commences July 1, 2005 . . . and shall continue until December 31, 2007 unless terminated early or extended through procedures pursuant to the provisions herein."  (<u>Id.</u> § 5.1.)

### ii.     Fees

Under the Distributor Agreement, Coyne's agreed to purchase the Products from CA at a price equal to a 50% markup over "COUNTRY ARTISTS' actual FOB . . . Cost for the Products."  (<u>Id.</u> § 3.1.)  Additionally, in the event that the parties were unable to agree on a Purchasing Plan for the upcoming year, Coyne's was required to purchase enough of the Products to achieve a "value of sales" equal to the greater of $5 million or the actual value of Coyne's sales in the preceding calendar year increased by 5%.  (<u>Id.</u> § 4.2.)  If Coyne's failed to achieve this level of "value of sales" for two consecutive calendar years, CA would have the right to terminate the Distributor Agreement and Coyne's would lose the

4

right to extend the agreement beyond 2007.  (<u>Id.</u> §§ 5.2- 5.3.)

In order to achieve the "value of sales," Coyne's was required to "use its best efforts, at its expense, to promote the sale of the Products . . . and shall be responsible for all advertising, marketing and public relations efforts in that regard."  (<u>Id.</u> § 4.1.)  Coyne's alleges that it did expend substantial time, money (over $1,500,000), and effort to develop an extensive marketing plan for the U.S. market.  (Compl. ¶¶ 66, 68-69.)  As part of this plan, in 2006 and 2007, Coyne's developed and produced catalogs advertising the Products, which displayed a copyright notice in favor of Coyne's.  (<u>Id.</u> ¶ 68.)

### iii.    Termination

A number of early termination procedures are included in the Distributor Agreement.  As previously explained, CA could terminate the contract if Coyne's failed to meet its sales obligations.  CA could also terminate the Distributor Agreement if Coyne's assigned or attempted to assign any interest in the agreement without CA's prior written consent.  (Distributor Agreement § 5.5.)  Finally, either party could serve upon the other party written notice to terminate the agreement if the other party becomes insolvent, files a bankruptcy petition, makes a general assignment for the benefit of its creditors, or has a receiver or

trustee appointed for its business or properties; or if the other party committed a

material breach of the agreement.  (Id. § 5.4.)  If CA terminated the Distributor

Agreement without cause and prior to end of the agreement term, CA "shall be

required" to repurchase its inventory, reimburse Coyne's for reasonable costs to

discontinue as a distributor, and pay Coyne's a termination fee of $1.5 million or

20% of gross sales of the product for the prior twelve months.  (Id. § 6.1.)

### iv.     Purchase Orders

CA agreed to use its best efforts to accept orders within ten business days

of the receipt of such orders.  (Distributor Agreement § 2.2.)  CA also agreed to

use reasonable efforts to deliver each order within the agreed-upon time period

or a within a reasonable time.  (Id.)  "Ownership of the Products shall not pass to

COYNE'S until COUNTRY ARTISTS has received in full (in cash or cleared

funds) all sums due to it in respect of the Products."  (Id.)  CA was to bill Coyne's

for its orders upon shipment, and Coyne's agreed to pay the invoice within 30

days of the invoice date.  (Id. § 3.7.)  Coyne's asserts that it has always made

timely payment.  (Compl. ¶ 17.)

### b.     Share Purchase Agreement between CA and Coyne's

At the same time that CA and Coyne's entered into the Distributor

6

Agreement, they also entered into an agreement for Coyne's to purchase CA's business in the United States ("Share Agreement").  (Ex. B to Steinlage Aff.) Under the agreement, Coyne's paid $989,097 for the Shares of Country Artists USA, Inc.  (Id. § 2.2.)

c.      **Asset Sale Agreement between CA and Enesco**

On August 10, 2007, Orton and Graham were appointed as Receivers for CA.  (Compl. ¶ 22).  Orton and Graham immediately entered into an Asset Sale Agreement with Enesco.  (Ex. B to Second Steinlage Aff.)  Pursuant to the agreement, CA sold Enesco "such right, title and interest as it may have in the Business and Assets."  (Id. § 1.2.)  Enesco "acknowledge[d] that [the CA name] may not be the property of [CA] and that accordingly any use of the Name by [Enesco] shall be at [Enesco's] own risk."  (Id. § 11.1.)  Enesco also acknowledged that the intellectual property rights, including trademarks and copyrights, "may be subject to restrictions or deficiencies that have not been disclosed to [CA] and that as a result they may not be capable of being transferred to [Enesco]."  (Id. § 8.1.)

Enesco was to operate CA's assets as a going concern, meaning that Enesco would keep the CA business operational.  (Compl. ¶ 24.)  The asset sale did not

include any products which left CA's facilities "in the course of delivery to customers" by August 10, 2007.  (Asset Sale Agreement, Sched. 4 § 6.)  It also did not include any assets owned by a third party.  (<u>Id.</u> § 16.)

Finally, CA and its Receivers "agree and undertake to serve by fax between 9 a.m. and 10 a.m. on Monday 13 August 2007 the Termination Notices on all of the relevant parties to the Distribution Agreements."  (Asset Sale Agreement § 5.1.4.)  However, CA and the Receivers did not send the termination notice to Coyne's until August 21, 2007.  (Compl. ¶ 43.)

### 3.   Enesco's Acquisition of CA Assets and Subsequent Business Dealings between CA, Coyne's, and Enesco

As of August 12, 2007, products bearing the Coyne's name and logo had already been shipped to warehouses for delivery to Coyne's, while other products were being held by manufacturers in China for future delivery and still others were in varying degrees of manufacture.  (Compl. ¶ 28.)  The completed products and the products being manufactured were in fulfillment of purchase orders sent by Coyne's on or prior to August 12, 2007.  (<u>Id.</u> ¶ 29.)

On August 13, 2007, Matthew Bousquette ("Bousquette"), Enesco's Chairman, and Basil Elliott ("Elliot"), Enesco's president and CEO, notified

Coyne's of Enesco's acquisition of CA.  (Compl. ¶¶ 31-32.)   They told Coyne's

that Enesco was looking to acquire additional giftware companies and that it had

purchased CA primarily for the "UK market."  (Id. ¶ 33.)  Bousquette told

Coyne's that he did "not have a pre-ordained plan for the USA market," and

acknowledged Coyne's exclusivity provision in the Distributor Agreement, but

stated that Enesco had made no decision about how to proceed with Coyne's.

(Id.)

On August 16, 2007, Coyne's complained to Enesco about broken delivery

schedules that were preventing Coyne's from delivering the Products to its own

customers and asserted its expectation to continue its distribution rights through

to 2008.  (Id. ¶ 34.)  Bousquette stated that "Enesco wanted to work out an

agreement with Coyne's," but that he needed certain detailed sales information

to conduct "due diligence."  (Id. ¶ 35.)

On August 21, 2007, Coyne's contacted CA to request shipping documents

for orders in transit for delivery to Coyne's.  (Compl. ¶ 36.)  Some of these orders

"had items related to Product units that Coyne's had previously received and for

which it had made full payment."  (Id.)

CA informed Coyne's that Enesco had instructed CA not to release the

documents.  (Compl. ¶ 37.)  Coyne's asked Elliot for immediate release of the

shipping documents.  (Id.)  That same day, the Receivers sent the termination

notice to Coyne's.  (Id. ¶ 43.)

Elliot and Bousquette met with representatives from Coyne's on August

22, 2007, and discussed, among other things, "Enesco's purported interest in

working out a sales distribution agreement with Coyne's."  (Compl. ¶ 38.)  As a

condition of further discussion, Enesco requested that Coyne's disclose

confidential and proprietary information relating to Coyne's purchase orders,

including the product it had received from CA and product still on order with

CA.  (Id. ¶ 39.)

Coyne's alleges that during that meeting, Bousquette stated "that he

believed that some sales distribution agreement could be worked out that would

benefit both Enesco and Coyne's."  (Compl. ¶ 39.)  Bousquette promised that

Enesco would assist Coyne's in obtaining shipping documents necessary for

Coyne's to obtain the Product as soon as Coyne's provided him with the

information he had requested.  (Id. ¶ 40.)  After the meeting, both companies

signed a mutual nondisclosure agreement dated August 22, 2007.  (Id. ¶ 41.)

Coyne's asserts that it then provided confidential information regarding

Coyne's open product orders to Enesco.  (Compl. ¶ 41.)  Next, Coyne's emailed

Elliot requesting Enesco's assistance in obtaining the shipping documents Enesco

had promised Coyne's in order for Coyne's to obtain possession of the product

shipped to Minnesota.  (Id. ¶ 42.)  Elliot stated that weather had caused Enesco's

office to close and caused communications issues with Enesco's UK office, but

"that Enesco should be in a position to understand the entire situation regarding

the shipments early the following week."  (Id.)

On August 23, 2007, Coyne's notified the Receivers that the letter

terminating the Distributor Agreement was not in accordance with the terms of

the Distributor Agreement and that "the notice was a nullity."  (Compl. ¶ 43.)

Coyne's provided additional confidential information to Enesco on August

28, August 30, September 4, and September 12.  (Compl. ¶¶ 45-46, 48, 55.)

On September 12, 2007, representatives of Coyne's again met with

representatives of Enesco to discuss finalizing an agreement between the two

companies.  (Compl. ¶ 53.)  They "discussed the outline of a possible agreement,

which Enesco then agreed to memorialize in writing and send to Coyne's as soon

as possible."  (Id. ¶ 55.)  Enesco reiterated that it would arrange to release the

shipping documents Coyne's had requested once Coyne's provided a detailed

inventory report to Enesco.  (Id. ¶ 54.)

By September 19, 2007, after Enesco had failed to provide assistance in obtaining the shipping documents, Coyne's attempted to contact the product manufacturers to arrange direct payment for and release of the products. (Compl. ¶ 58.)  On September 20, Enesco sent a form letter to retailers, including customers of Coyne's, that Enesco would begin distribution of the CA product lines.  (Id. ¶ 60.)  On September 21, Enesco issued a press release stating the same. (Id.) Coyne's discovered that, as of September 21, Enesco had paid at least one manufacturer and secured the shipping documents for the product units Coyne's had been attempting to have released.  (Id. ¶ 59.)  Coyne's believes that Enesco has now taken possession of the remainder of the product units Coyne's had ordered. (Id.)

B.   **Procedural Background**

On September 26, 2007, Coyne's filed a Complaint against Defendant Enesco.  On September 27, 2007, Coyne's filed a motion for a temporary restraining order.  On October 4, 2007, Coyne's filed an Amended Complaint against Enesco.

The Court denied Coyne's motion for a temporary restraining order on

October 12, 2007.  In its October 12 Order, the Court declined to grant injunctive

relief because it did not find a likelihood of success on the merits for claims based

on a violation of the Minnesota Franchise Act nor claims based on the

infringement of intellectual property rights.  The Court found a likelihood that

the additional markup paid by Coyne's did not constitute a franchise fee that

would bring the Distributor Agreement under the scope of the Minnesota

Franchise Act.  Coyne's did not have a claim for infringement of intellectual

property rights against Enesco because it neither owned the copyrights and

trademarks for the products, nor did it have an exclusive license to those

copyrights and trademarks.  The Court did not address the merits of other claims

because it found that Coyne's had an adequate remedy at law for those claims.

Coyne's has appealed the Court's denial of Coyne's motion for a

temporary restraining order.  The appeal is still pending before the Eighth Circuit

Court of Appeals.

On December 8, 2007, Coyne's filed its Second Amended Complaint

against Defendants Enesco, CA, Orton, and Graham.  In the Second Amended

Complaint, Coyne's alleges: Count I, interference with contractual relations by

Enesco; Count II, interference with prospective relations by Enesco; Count III,

promissory estoppel by Enesco; Count IV, federal trademark infringement in

violation of the Lanham Act § 32, 15 U.S.C. § 1114, by Enesco; Count V, federal

unfair competition in violation of the Lanham Act § 43, 15 U.S.C. § 1125(a), by

Enesco; Count VI, copyright infringement under 17 U.S.C. § 501 by Enesco;

Count VII, violation of Minn. Stat. § 325D.44, deceptive trade practices, by

Enesco; Count VIII, violation of Minn. Stat. § 325C.01, misappropriation of trade

secrets, by Enesco; Count IX, conversion of goods and good will by Enesco;

Count X, violation of the Minnesota Franchise Act by all Defendants; Count XI,

unfair or inequitable practice in violation of Minn. Stat. § 80C.14 by Enesco and

the Receivers; Count XII, breach of contract by CA and the Receivers; and Count

XIII, rescission of share purchase agreement by CA and the Receivers.

Enesco requests that Counts I through XI – all of the claims against it – be

dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III.   DISCUSSION

### A.    Standard of Review and Jurisdiction

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may

move the Court to dismiss a claim if, on the pleadings, a party has failed to state a

claim upon which relief may be granted.

14

> [T]he district court's grant of a motion to dismiss [is reviewed] *de novo*. Dismissal is proper where the plaintiffs' complaint fails to state a claim upon which relief can be granted. At this stage of the litigation, we accept as true all of the factual allegations contained in the complaint, and review the complaint to determine whether its allegations show that the pleader is entitled to relief. The plaintiffs need not provide specific facts in support of their allegations, but they must include sufficient factual information to provide the "grounds" on which the claim rests, and to raise a right to relief above a speculative level.

Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir. 2008) (citations omitted). "A motion to dismiss should be granted if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Students for Sensible Drug Policy Found. v. Spellings, 523 F.3d 896, 899 (8th Cir. 2008) (citation omitted).

When deciding a motion to dismiss the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." PureChoice, Inc. v. Macke, No. 07-1290 (DWF/SRN), 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (unpublished) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th. Cir. 1999)). The Distributor Agreement, the Share Agreement, and the Asset Sale Agreement are embraced by the Second Amended Complaint and are considered with the

pleadings.  Affidavits submitted in relation to the motion for a temporary

restraining order, however, are not embraced within the Second Amended

Complaint and are not considered.  Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)

("In passing on a motion to dismiss because the complaint fails to state a cause of

action, the facts set forth in the complaint are assumed to be true and affidavits

and other evidence produced on application for a preliminary injunction may not

be considered."), overruled on other grounds by Larson v. Domestic & Foreign

Commerce Corp., 337 U.S. 682 (1949).

An appeal of this Court's Order denying the motion for a temporary

restraining order is currently pending before the Eighth Circuit Court of Appeals.

Although, generally, the filing of a notice of appeal divests the district court of

jurisdiction, Liddell v. Board of Educ. of City of St. Louis, 73 F.3d 819, 822 (8th

Cir. 1996), this general rule does not apply in this case.  "[A]n appeal from an

order regarding an injunction does not stay other proceedings before the district

court, Janousek v. Doyle, 313 F.2d 916, 920 (8th Cir. 1963), and does not prevent

the district court from deciding the litigation on its merits, West Publishing Co. v.

Mead Data Ctr., Inc., 799 F.2d 1219, 1229 (8th Cir. 1986)."  Frye v. Minn. Dept. of

Corrections, Civil No. 05-1327 (JNE-JJG), 2007 WL 2475964, at *2 (D. Minn. Aug.

28, 2007) (unpublished).

**B.      Count I: Interference with Contractual Relations**

**1.      Standard**

Under Minnesota law, a claim for tortious interference with contractual relations requires a showing of "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 900 (Minn. 1982) (citation omitted).

In summary, Coyne's alleges that Enesco, its competitor, knew Coyne's was the exclusive distributor of CA products and had placed orders for products; and that notwithstanding this knowledge, Enesco refused to release product units in a move designed to acquire the benefit of the product units, causing Coyne's damage.  Enesco claims that Coyne's has failed to state grounds for relief by failing to plead facts sufficient to support any of the five elements of the claim.

**2.      Existence of a Contract**

Enesco claims that Coyne's must specifically identify the particular contract with which Enesco has interfered.  Coyne's argues that it has identified a number of contracts, including the Distributor Agreement and its customer sales

17

agreements, with which Enesco has interfered.

While not specifically identified under Coyne's statement of Count I, the existence of the Distributor Agreement between Coyne's and CA is well pled throughout the Second Amended Complaint and does not rely on conclusory statements. The Second Amended Complaint also mentions Coyne's customers' orders and Coyne's development of a retail distribution network. (Compl. ¶¶ 45, 55, 65-68.) Taking the statements as true and making all reasonable inferences, Coyne's has also sufficiently pled that contracts existed between Coyne's and its customers/retailer network.

### 3.    Knowledge of the Contract

Coyne's sufficiently alleges that Enesco knew about the Distributor Agreement. (<u>See, e.g.</u>, Compl. ¶ 33.)

Coyne's asserts that Enesco was also aware of Coyne's contracts with its customers. Coyne's argues that Enesco was a competitor and it possessed Coyne's confidential sales information, so it knew the extent of Coyne's contractual commitments. The Second Amended Complaint alleges that Enesco was informed about Coyne's customers who were unhappy because of the failure to deliver the ordered products. (Compl. ¶ 45.) It also alleges that Coyne's

passed along information about quantities that would fulfill customers' orders,

although it does not indicate that the customers were particularly identified to

Enesco.  (Id. ¶ 55.)

In determining the whether the defendant had knowledge, "[it] is not

necessary to prove that a third party possesses actual knowledge of a contractual

relationship with other parties.  It is enough to demonstrate that defendant had

knowledge of facts which, if followed by reasonable inquiry, would have led to a

complete disclosure of contractual relations and the rights of the parties." Casino

Resorts, Inc. v. Monarch Casinos, Inc., No. C3-97-843, 1997 WL 793134, at *4

(Minn. Ct. App. Dec. 30, 1997) (unpublished) (citing Swaney v. Crawley, 191

N.W. 583, 584 (Minn. 1923)).  In this case, it is sufficient to allege interference with

existing customers without identifying the customers in the Second Amended

Complaint.  The Complaint plausibly supports a claim that Enesco knew or had

reason to know that Coyne's had accepted orders from customers and was bound

to perform the obligations of those contracts.

### 4.     Intentional Procurement of Breach

#### a.     Distributor Agreement

Enesco argues that Coyne's has not asserted any facts to show that Enesco

intentionally procured a breach of a contract.  It asserts that Coyne's has not

connected Enesco's refusal to release product units to any action by CA that

qualifies as a breach.  Further, Enesco argues that, under the Distributor

Agreement, Coyne's had no right to the units because it had not paid for them.

### i.      Ownership of the Product Units

Coyne's attempts to use Section 336.2-501 of the Minnesota Uniform

Commercial Code to establish that it had a special property interest in the

products for which it had not yet paid.  This statute states:

> (1) The buyer obtains a special property and an insurable interest in
> goods by identification of existing goods as goods to which the
> contract refers even though the goods so identified are
> nonconforming and the buyer has an option to return or reject them.
> Such identification can be made at any time and in any manner
> explicitly agreed to by the parties.  In the absence of explicit
> agreement identification occurs
>
> * * *
>
> (b) if the contract is for the sale of future goods . . . , when goods are
> shipped, marked or otherwise designated by the seller as goods to
> which the contract refers;

Minn. Stat. § 336.2-501.  Coyne's asserts that, under this statute, it had a special

property interest in the CA Product.

Minnesota Statute § 336.2-502, which deals with buyer's right to goods on

20

seller's insolvency, permits a buyer with a special property interest who has paid all or part of the price of the goods to recover those goods from the buyer. Recovery of goods can occur only if the buyer tenders the unpaid portion of the price and if the seller became insolvent within 10 days after receipt of the first installment on the price.  Id.; In re Paoletti, 205 B.R. 251, 260 (Bankr. N.D. Cal. 1997).  As the pleading does not allege any payments had been made for the items, this section would not apply.  Furthermore, the Distributor Agreement clearly states that ownership of the CA products does not pass to Coyne's until Coyne's has paid in full for those products.  Finally, products not shipped to Coyne's by August 10, 2007, were sold to Enesco, so any failure to provide those products to CA caused by Enesco would not give rise to a tortious interference claim by Enesco.

### ii.    Late Termination Notice

Coyne's also asserts that it is evident that Enesco caused the Receivers to breach the Distributor Agreement by serving a defective termination notice after the deadline set in the Asset Sale Agreement.  However, there is no fact alleged in the Complaint that would give rise to this conclusion.  There is no allegation that Enesco improperly influenced the Receivers' decision to send the termination

letter on August 21.

### iii.    Release of Shipping Documents

Despite these failures, the Second Amended Complaint does sufficiently allege an instance of Enesco intentionally procuring a breach of the Distributor Agreement.  Coyne's states that when it contacted CA to obtain the shipping documents, CA informed Coyne's that Enesco instructed CA not to release them. (Compl. ¶ 37.)  If true, this action may have been sufficient for Enesco to have procured a breach in the Distributor Agreement.  CA was contractually obligated to deliver the products within a reasonable time frame and to invoice Coyne's upon shipment.  Coyne's was not required to pay for the products until 30 days after the invoice date.  Products shipped by August 10, 2007, had not been sold to Enesco, so CA still maintained its contractual obligations with regard to those products already in transit.  While Coyne's may not have owned the products, it has properly alleged that it was entitled to receive delivery of the products and that CA, rather than Enesco, had the contractual obligation to deliver those products. A reasonable inference can be made that CA unreasonably withheld delivery due to the instructions from Enesco.  A breach of the Distributor Agreement has been sufficiently alleged.

22

### b.      Customer Sales Agreements

With respect to the alleged contract between Coyne's and its customers,

Coyne's has sufficiently alleged that Enesco intentionally caused CA to

unreasonably withhold delivery, which forced Coyne's to breach its contracts

with its customers by failing to delivery promised products.  (See, e.g., Compl.

¶ 45.)

### 5.      Justification

Enesco argues that Coyne's has failed to plead a lack of justification.

Enesco states that it had no legal obligation to Coyne's.  Further, Enesco asserts

that it had no obligation to sell CA products to Coyne's.

"Ordinarily, whether interference is justified is an issue of fact, and the test

is what is reasonable conduct under the circumstances."  Kjesbo v. Ricks, 517

N.W.2d 585, 588 (Minn. 1994) (citation omitted).  Coyne's and Enesco are

competitors, and one's failure to sell products to the other could be seen as

motivated by valid business interests.  This argument would be successfully

applied to products sold to Enesco by CA and not owned by Coyne's.  However,

despite the interest in preserving competition, the pleading sufficiently alleges

that Enesco attempted to improperly prevent the release of shipping documents

by CA, although Enesco had no contractual right to those products shipped by

August 10, 2007, so that Enesco could, itself, sell those CA products.  Coyne's

sufficiently alleges facts which if true would indicate that Enesco sought to

improperly strip business from Coyne's.

### 6.   Damages

"The measure of damages for tortious interference with contractual

relations is the loss of the benefit of the contract or the prospective relationship

and other losses directly caused by the interference."  Strong Const. Co., Inc. v.

Atlantis Developers, No. A05-1363, 2006 WL 1529361, at *3 (Minn. Ct. App. June

6, 2006) (unpublished) (citing Potthoff v. Jefferson Lines, Inc., 363 N.W.2d 771,

777 (Minn. Ct. App. 1985)).

Coyne's asserts a cost in excess of $1.5 million in developing and acquiring

the CA business in the United States.  Based on Enesco's action preventing CA

from releasing the shipping documents, Coyne's asserts damage to its business

reputation, goodwill and retailer sales network.  These assertions are sufficiently

pled for this element to survive a motion to dismiss.

### 7.   Conclusion

Coyne's has sufficiently pled facts that state a claim for tortious

interference with contractual relations with respect to the Distributor Agreement and the individual contracts Coyne's claims with its customers based on the allegation that Enesco caused CA to refuse to release the shipping documents.

### C.    Count II: Interference with Prospective Relations

#### 1.    Standard

In Minnesota, a party "intentionally and improperly interferes with another's prospective business relation by (1) inducing a third person not to enter into or to continue the prospective relations; or (2) preventing the other from continuing the prospective relationship." Hough Transit, 472 N.W.2d at 361 (citation omitted).

Coyne's asserts that "Enesco's intentional interference with the shipment of Products to Coyne's has prevented and will continue to prevent Coyne's from maintaining and enhancing its ability to acquire Product units for sale to its existing and prospective customers." (Compl. ¶ 78.) It asserts that the Asset Sale Agreement demonstrates that Enesco had no interest in the CA products shipped to Minnesota for Coyne's, the CA products manufactured for Coyne's, and use of the CA intellectual property in the Territory.

#### 2.    Identification of a Specific Economic Relationship

Enesco argues that to succeed on this claim Coyne's must specifically identify an economic relationship with another party that would economically benefit Coyne's, and that Coyne's fails to specifically identify any party.

Here, viewing the Complaint in the light most favorable to Coyne's, Coyne's has pled that it has built a network of retailers through which it marketed and sold CA products. It alleges that Enesco prevented Coyne's from receiving product to which Coyne's was entitled by preventing the release of shipping documents. Coyne's has sufficiently pled that Enesco's actions prevented Coyne's from being able to distributed CA products to which it was entitled to its existing and prospective customers.

### 3. Commission of a Wrongful Act

Enesco argues that Coyne's has failed to allege that Enesco committed a wrongful act because, while it alleges that Coyne's ordered certain products from CA, it does not allege that it paid for those products. Under the Distributor Agreement, Coyne's only owns products for which it already paid. Therefore, Coyne's does not allege that Enesco is required to release the products to Coyne's or honor any orders that Coyne's placed with CA before August 10, 2007. While, as previously explained, Coyne's has failed to allege that it owned the products,

26

it has sufficiently alleged that Enesco's wrongly caused CA to refuse to release

the shipping documents to Coyne's, preventing Coyne's from fulfilling customer

orders.  On this latter basis, Coyne's has sufficiently stated a claim for tortious

interference with prospective relations.

> **D.     Count III: Promissory Estoppel**

> **1.     Standard**

"The application of promissory estoppel requires the analysis of three

elements: 1. Was there a clear and definite promise? 2. Did the promisor intend to

induce reliance, and did such reliance occur? 3. Must the promise be enforced to

prevent an injustice?"  <u>Ruud v. Great Plains Supply, Inc.</u>, 526 N.W.2d 369, 372

(Minn. 1995) (citation omitted).

> **2.     Clear and Definite Promise**

Enesco asserts that this claim fails because Coyne's does not allege a clear

and definite promise from Enesco that the product units would be delivered.

Instead, Coyne's merely alleges that there were "negotiations" between the

parties.  (<u>See, e.g.</u>, Compl. ¶¶ 81-82.)

The Court agrees that much of the Second Amended Complaint alleges

negotiations and dialogue between Enesco and Coyne's, which are not actionable

under a claim of promissory estoppel.  However, viewing the Second Amended

Complaint in the light most favorable to Coyne's, there are certain paragraphs

that allege that Enesco made a promise to Coyne's to assist it in obtaining the

shipping documents.  The Second Amended Complaint provides that, on August

22, 2007, Bousquette promised Coyne's that, if Coyne's provided it with certain

information, Enesco would assist Coyne's in obtaining the shipping documents

necessary for Coyne's to obtain its CA products then stored in Minneapolis.

(Compl. ¶ 40.)  It alleges that, on September 12, 2007, Bousquette stated that if

Coyne's provided Enesco with a detailed inventory report, Enesco would arrange

for the release of the required shipping documents to Coyne's.  (Id. ¶ 54.)

Coyne's claims it relied on Enesco's promises, as Enesco intended, to provide the

confidential financial information.  Then, Enesco simply used the shipping

documents to secure the Products for its own use.  Coyne's concludes that

"Enesco has damaged Coyne's by its promises to deliver the Product units to

Coyne's and its refusal to perform those promises, even though Coyne's has done

everything that Enesco asked it to do as a condition to Enesco's releasing the

units to Coyne's."  (Id. ¶ 85.)

       To the extent that Count III is based on Enesco's alleged promise to assist

in obtaining shipping documents, as pled in Paragraphs 40 and 54, it survives the

Motion to Dismiss.

### E.     Count IV: Federal Trademark Infringement

#### 1.     Standard

Coyne's has brought a claim for trademark infringement under § 32 of the

Lanham Act, 15 U.S.C. § 1114.

As this Court previously held in its Order denying the motion for a

temporary restraining order, a party does not have standing to bring a trademark

infringement claim unless it is the owner or, under certain circumstances, the

exclusive licensee for that trademark.  Coyne's & Co., Inc. v. Enesco, LLC, No.

07-4095, 2007 WL 3023345, at *4 (D. Minn. Oct. 12, 2007) (unpublished) (citing

Hot Stuff Foods, LLC v. Mean Gene's Enters., Inc., 468 F. Supp. 2d 1078, 1094

(D.S.D. 2006)).  See also Fin. Inv. Co. (Bermuda) Ltd. v. Geberit AG, 165 F.3d 526,

531 (7th Cir. 1998) ("Authorities uniformly agree that only the trademark's

registrant (or her assignee) may sue under § 32(1).  This rule is consistent with 15

U.S.C. § 1127, which defines the term "registrant" to include assignees but not

licensee.") (citations omitted).

This Court also previously noted that, "[e]ven if Coyne's did have an

exclusive license to use CA's trade marks, an exclusive licensee cannot sue the owner of such trade mark." <u>Coyne's & Co., Inc.</u>, 2007 WL 3023345, at *4 (citing <u>Westowne Shoes, Inc. v. Brown Group, Inc.</u>, 104 F.3d 994, 997 (7th Cir. 1997)).

## 2. Standing

Coyne's has failed to allege that it has standing to assert this claim. While Coyne's alleges that it was an "authorized user" of the CA trademarks, it does not allege that it owns the trademarks in question. Additionally, the Distributor Agreement clearly states that CA retained ownership of the trademarks. (Distributor Agreement § 7.1.) In particular, § 7.2 of the Distributor Agreement states:

> COUNTRY ARTISTS hereby authorizes COYNE'S to use the Trade Marks in the Territory in relation to the Products for purposes only of exercising its rights and performing its obligations under this Agreement. Such rights shall cease immediately upon termination of this Agreement, other than as is necessary to make sales pursuant to Section 5 or Section 6.2.

> Section 7.7 states:

> Except as provided in this Agreement COYNE'S shall have no rights in respect of any intellectual property rights however used by COUNTRY ARTISTS in relation to the Products and COYNE'S hereby acknowledge that it shall not acquire any rights in respect thereof and that such intellectual property rights are and shall remain vested in or controlled by COUNTRY ARTISTS.

The term "exclusive" does not appear in either provision.  Coyne's only had rights to use the trademarks for the limited purpose of selling CA goods within a certain territory during the term of the agreement.  These rights were not exclusive, and the Distributor Agreement did not vest ownership of the trademarks in Coyne's.

At best, Coyne's was a non-exclusive licensee, so it has no right to assert a trademark claim against any third party, let alone against Enesco, who is the current owner of the trademarks through its asset purchase transaction with CA.  Additionally, the Distributor Agreement provides that, to the extent Coyne's has any right to "prosecute litigation against third parties known or suspected to have made improper use of the Trade Marks,"  Coyne's may not do so "without the prior consent" of CA.  (Distributor Agreement § 7.12.)  Coyne's has not pled that CA has consented to Coyne's infringement claim.

The Court concludes that Plaintiff has failed to plead that it has standing to bring a trademark claim.

### F.      Count V: Federal Unfair Competition

#### 1.      Standard

Coyne's asserts that Enesco violated the Lanham Act § 43(a)(1)(A), which

provides that

> [a]ny person who, on or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false
> or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as
> to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his or
> her goods, services, or commercial activities by another person . . .
>
> * * *
>
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

### 2.    Standing

Enesco asserts that Coyne's lacks standing to assert this claim because it

has not alleged that it is the owner of the trademarks at issue.

A plaintiff under § 43(a) of the Lanham Act need not own a registered

trademark.  Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir. 1995).

Instead, when a claim is based on a false association claim – as in this case – in

order to have standing, the plaintiff must "have a reasonable interest to be

protected" such as a plaintiff "with a commercial interest in the product

32

wrongfully identified with another's mark, . . . or with a commercial interest in

the misused mark." Id. (citations omitted).  The statute grants standing to"any

person who believes that he or she is likely to be damaged" by the prohibited

conduct.  15 U.S.C. § 1125(a).  The Court concludes that this language confers

standing on trademark licensees.  See, e.g., Quabaug Rubber Co. v. Fabiano Shoe

Co., Inc., 567 F.2d 154, 160 (1st Cir. 1977) (holding that licensee was not a

registrant, exclusive licensee, or assignee of trademark, but still had standing to

assert false designation claim under 15 U.S.C. § 1125(a)).

The Second Amended Complaint and Distributor Agreement permit a

plausible argument that Coyne's is a licensee with standing to assert this claim,

so the Court denies the motion to dismiss Count V.

## G.    Count VI: Copyright Infringement

### 1.    Standard

As this Court previously held, "[t]he Copyright Act authorizes only two

types of claimants to sue for copyright infringement: (1) owners of copyrights,

and (2) persons who have been granted exclusive licenses by owners of

copyrights."  Coyne's & Co., Inc., 2007 WL 3023345, at *4 (quoting Eden Toys, Inc.

v. Florelee Undergarment Co., 697 F.2d 27, 32 (2d Cir. 1982)).  Thus, a

nonexclusive licensee has no standing to sue for copyright infringement.

### 2.     Standing

Coyne's has not adequately pled that it was the owner or exclusive licensee of the copyrights at issue.  As the Court previously found by examining the language of the Distributor Agreement, Coyne's does not have an exclusive license in the CA copyrights; therefore, the Court dismisses Count VI.

### H.     Count VII: Minnesota Deceptive Trade Practices Act

### 1.     Standard

Enesco infers that Coyne's is alleging that Enesco passed off Coyne's goods as its own in violation of subdivision 1(1); caused a likelihood of confusion as to affiliation, connection, or association with, or certification by Coyne's in violation of subdivision 1(3); represented that goods have sponsorship and approval from Coyne's in violation of subdivision 1(5); and disparaged Coyne's business through false and misleading representations in violation of subdivision 1(8). Minn. Stat. § 325D.44.  Enesco asserts that Coyne's lacks standing to bring this claim.

Claims for deceptive trade practices are analyzed under the same rubric as claims under the federal Lanham Act.  <u>Aviation Charter, Inc. v. Aviation</u>

<u>Research Group/US</u>, No. Civ.03-2439 PAM/RLE, 2004 WL 1638176, at *5 (D.

Minn. July 10, 2004) (unpublished), <u>aff'd</u>  416 F.3d 864 (8th Cir. 2005).

###    2.    Standing

Because the Court concludes that Coyne's has standing to pursue the

Lanham Act false designation claim, the Court also finds that Coyne's has

standing to pursue this claim.

###    3.    Specificity

Enesco also asserts that Coyne's has failed to plead this claim with the

requisite specificity.  Claims under Minn. Stat. § 325D.44 must be pled with

specificity.  <u>Masterson Personnel, Inc. v. The McClatchy Co.</u>, No. Civ. 05-1274

RHK/JJG, 2005 WL 3132349, at *5 (D. Minn. Nov. 22, 2005) (unpublished).  In

order to meet this pleading requirement, a plaintiff must allege the "who, what,

when, where and how" for each fraud claim.  <u>Parnes v. Gateway 2000, Inc.</u>, 122

F.3d 539, 550 (8th Cir. 1997) (citation omitted).

In this case, Enesco asserts that Coyne's has alleged no facts to show that

Enesco has done anything to cause confusion or misunderstanding in the

marketplace as to its affiliation with Coyne's.  It claims that Coyne's has not

alleged facts to show that Enesco has represented that CA products have Coyne's

35

sponsorship or approval, or that Enesco has disparaged Coyne's business.

Instead, Coyne's merely asserted these legal conclusions.  (Compl. ¶¶ 100-02.)  It

pled generally that "Enesco sent a form letter to retailers, many of Coyne's

customers specifically notifying them that Enesco was going to begin the

distribution of the Country Artists product lines . . . .  Enesco also issued a press

release also providing notice that Enesco was going to begin the distribution of

the Country Artist product lines."  (Id. ¶ 60.)  Enesco asserts that these allegations

give no indication that Enesco's actions were willfully or knowingly false or

misleading.

Coyne's has pled that Enesco engaged in a deceptive trade practice by

misappropriating Coyne's rights of exclusivity and advertising to the

marketplace by competing with Coyne's in the exclusive Territory.  Coyne's

claims it is the exclusive distributor of CA products, yet Enesco notified Coyne's

customers directly and issued a press release announcing that it was now selling

the CA product line.  Coyne's asserts that these false representations were likely

to cause confusion in the market between Coyne's status as the exclusive

distributor of the CA product line and Enesco's own claims to that status.

Throughout the Second Amended Complaint, but not specifically within

this count, Coyne's has pled the dates of the statements, the contents, the general

audience, the speaker, the falsity of the statements, and Enesco's knowledge that

Coyne's was the exclusive distributor within the Territory.  Within Count VII, it

alleges that these actions disparaged Coyne's.  The allegations are sufficiently

particular.  The Court denies the motion to dismiss this count.

### I.      Count VIII: Minnesota Trade Secrets Act

### 1.      Improper Use or Disclosure of Another's Trade Secret

Coyne's has asserted a claim for misappropriation of trade secrets under

Minn. Stat. § 325C.  Enesco infers that Coyne's is asserting a violation of

§ 325C.01, subd. 3(ii), prohibiting disclosure of use of a trade secret without

consent by a person under certain circumstances.

In its Second Amended Complaint, Coyne's generally identifies the

purported protected information, but it does not allege that Enesco actually

disclosed or used any alleged trade secrets.  At most, Coyne's alleges that Enesco

"used improper means to acquire information from Coyne's," (Compl. ¶ 105),

but it also alleges that Coyne's only disclosed information to Enesco after the

parties signed a mutual nondisclosure agreement.

Coyne's responds that its Second Amended Complaint implies that Enesco

necessarily used Coyne's confidential information because, otherwise, Enesco would not have been able to evaluate the marketing opportunity presented from the sale of the CA Products in the Territory.  It alleges that, shortly after entering the Asset Sale Agreement, Enesco told Coyne's that it had purchased these assets primarily for the "UK market" and that it had no "pre-ordained" plan in the Territory.  Coyne's alleges that Enesco misled Coyne's into believing that if it disclosed its information, Enesco would assist it in obtaining the documentation necessary to take physical possession of the CA products in transit to Minnesota, and Enesco would negotiate in good faith a forward-looking agreement that would enable Coyne's to continue to develop and sell the CA product line.

Instead, Coyne's claims, Enesco pretended to communicate with Coyne's but simultaneously made plans to enter Coyne's market to sell the CA products without any agreement with Coyne's.  Although not pled in the Second Amended Complaint, Coyne's asserts that its confidential information told Enesco which products in the CA product line are of interest to the market and the identity of the market segment interested in purchasing those products.

The parties disagree regarding the viability of the inevitable disclosure doctrine, but that issue is not before the Court at this time because Coyne's did

not allege that Enesco used or disclosed any confidential information at all, whether based on evidence of disclosure or the theory of inevitable disclosure.

The Court finds that, to the extent this count is based on disclosure or use of a trade secret, the count is deficient because Coyne's failed to allege that Enesco used or disclosed the information.

### 2.     Improper Acquisition of a Trade Secret

Minnesota Statute § 325C.01, subd. 3(i) prohibits "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  This subdivision does not require use or disclosure of the trade secret.  Coyne's has alleged that Enesco used improper means to acquire confidential information from it by falsely promising to assist in obtaining the shipping documents in exchange for receiving the confidential information.

Enesco notes that it purchased all of CA's assets out of receivership, which included all of CA's "Business Information," including "any and all Customer Details, . . . buying, production, . . . purchase ledgers, invoices, . . . and all other documentation and commercial information relating to the Business . . . ."  (Asset Purchase Agreement § 2.1.)  Thus, it claims that it legitimately possessed all of the

alleged confidential information.  At this stage of the litigation, the Court cannot determine whether the alleged confidential information revealed by Coyne's to Enesco was covered by the Asset Purchase Agreement.

Enesco also notes that, according to the Second Amended Complaint, Coyne's only disclosed information to Enesco after the parties signed a mutual nondisclosure agreement.  The issue of whether, in fact, Enesco properly or improperly acquired the information is best addressed at a later stage of the litigation.  Reviewing the Second Amended Complaint under the motion to dismiss standard, the Court concludes that Coyne's has sufficiently alleged that Enesco acquired confidential information from Coyne's using improper means.

## J.      Count IX: Conversion of Goods and Goodwill

"The elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest." Lassen v. First Bank of Eden Prairie, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994) (citations omitted).  The Second Amended Complaint simply alleges: "Enesco's actions unlawfully misappropriate and convert Coyne's property rights and goodwill."  (Compl. ¶ 107.)

### 1.      Conversion of Goods

40

Enesco claims that Coyne's has failed to identify which property rights or goods Enesco allegedly converted. While Coyne's alleges that certain shipments of CA product were held in storage including products that Coyne's ordered from CA before Enesco purchased CA, Coyne's does not allege that it paid CA for these products and, under the Distributor Agreement, Coyne's only owns products for which it already paid CA. Also, as previously noted, Minn. Stat. § 336.2-501 does not grant Coyne's property rights in the Products.

"A plaintiff's lack of an enforceable interest in the subject property is a complete defense against conversion." Lassen, 514 N.W.2d at 838. Coyne's has not sufficiently alleged that it had a property interest in the goods under either the Distributor Agreement or the U.C.C., so it has not properly alleged a claim for conversion of goods.

### 2.    Conversion of Goodwill

Coyne's also alleges that Enesco misappropriated and converted Coyne's goodwill. However, "[m]isappropriation of goodwill is generally only an element of trademark, trade dress, or unfair/deceptive trade practices claims; it is not a claim in and of itself." Rainbow Play Sys., Inc. v. GroundScape Techs., LLC, 364 F. Supp. 2d 1026, 1039 (D. Minn. 2005). The Court does not find authority for

41

recognition of a separate claim for conversion of goodwill under Minnesota law. The Court dismisses the claim for conversion of goodwill.

### 3.      Conversion of Copyrights and Trademarks

Coyne's also alleges that it has a property interest in CA's copyrights and trademarks in the Territory and Enesco has intentionally deprived Coyne's of its property interests by selling the CA products in Coyne's exclusive Territory. Coyne's claim contains no "extra element" to distinguish it from Coyne's copyright claims. Therefore, the Copyright Act preempts this claim of conversion of copyrights. 17 U.S.C. § 301(a); <u>DIRECTV, Inc. v. Beecher</u>, 296 F. Supp. 2d 937, 944 (S.D. Ind. 2003) ("To avoid preemption of the state law claims for theft and conversion, [the plaintiff] must show that those claims include an 'extra element' that changes the nature of the state law action so as to make it qualitatively different from a federal copyright infringement claim.") (citation omitted). As previously explained, Coyne's has not properly alleged a property interest in CA's copyrights or trademarks, so it cannot sustain a conversion claim based on copyright or trademark. Therefore, this claim is dismissed.

### K.      Minnesota Franchise Act (Counts X-XI)

#### 1.      Count X

Coyne's alleges that CA has damaged Coyne's franchise, in violation of the Minnesota Franchise Act, Minn. Stat. § 80C.01, et seq., because "Enesco has assumed Country Artists' roles as franchisor and vendor of the Products subject to the Distributor Agreement and Coyne's rights as franchisee," and has wrongfully terminated the Distributor Agreement, failed to perform its terms, and refused to recognize Coyne's franchise rights.  (Compl. ¶¶ 110-11.)

Enesco asserts that this claim should be dismissed because Coyne's is not a franchisee of CA; Enesco claims that the Distributor Agreement does not qualify as a franchise agreement because it did not require Coyne's to pay a franchise fee to CA.

### a.    Standard

A franchise is defined by three elements: "1) A right granted to the franchisee to engage in business using the franchiser's trade name or other commercial symbol; 2) a 'community of interest' in the marketing of goods or services between the franchisee and franchiser; and 3) a 'franchise fee' paid by the franchisee."  OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg Ab, 346 N.W.2d 162, 165-66 (Minn. Ct. App. 1984) (citation omitted).

### b.    Right to Engage in Business Using Franchiser's Trade

43

**Name or Other Commercial Symbol**

The Second Amended Complaint meets the first element because the

Distributor Agreement grants Coyne's license to use CA's trademarks in relation

to the Products in the Territory.  <u>Martin Investors, Inc. v. Vander Bie</u>, 269 N.W.2d

868, 874 (Minn. 1978).

### c.      Community of Interest

The Second Amended Complaint meets the second element because

Coyne's and CA profited from a common source through Coyne's marketing and

selling of the CA brand.  <u>Martin Investors, Inc. </u>, 269 N.W.2d at 874.

### d.      Franchise Fee

A franchise fee is

> any fee or charge that a franchisee or subfranchisor is required to
> pay or agrees to pay for the right to enter into a business or to
> continue a business under a franchise agreement, including, but not
> limited to, the payment either in lump sum or by installments of an
> initial capital investment fee, any fee or charges based upon a
> percentage of gross or net sales whether or not referred to as royalty
> fees, any payment for goods or services, or any training fees or
> training school fees or charges . . .

Minn. Stat. § 80C.01, subd. 9.  Certain payments are specifically excluded from

this definition.   <u>See</u> Minn. Stat. § 80C.01., subd. 9(a)-(f).

"Not all payments made by a purported franchisee over the course of a business relationship constitute franchise fees." <u>Sound of Music v. Minn. Mining & Mfg.</u>, 477 F.3d 910, 922 (7th Cir. 2007).  Franchise fees are only those fees paid in exchange for "the 'right' to enter into a business or the 'right' continue a business." <u>Id.</u> (citing Minn. Stat. § 80C.01, subd. 9).  Ordinary business expenses and reasonable minimum purchase requirements do not constitute franchise fees. <u>Id.</u>  Also, "the purchase of goods or agreement to purchase goods at a bona fide wholesale price" are not considered a franchise fee.  Minn. Stat. § 80C.01, subd. 9(a).

Enesco asserts that Coyne's alleges no facts from which it could be concluded that Coyne's paid CA any franchise fee.  Additionally, the Distributor Agreement states, "The parties agree that their relationship is that of buyer and seller only.  Nothing stated in this agreement and no action taken by the parties pursuant to this Agreement shall be construed as creating the relationship of . . . franchisee . . . between parties hereto."  (Distributor Agreement § 1.3.)  However, this provision is not determinative at this stage of the litigation.  Minn. Stat. § 80C.21.

### i.    The Markup

In its Second Amended Complaint, Coyne's alleges that "[t]he 50% markup Coyne's is obligated to pay under the Distributor Agreement to Country Artists is, in whole or in part, a 'franchise fee' under Minn. State § 80C.01, subd. 9." (Compl. ¶ 12.)  Coyne's also argues that it is illogical to assume that all of the rights granted to Coyne's under the Distributor Agreement, including the license to use the Trademarks, the limitation on CA's right to compete with Coyne's in the Territory, and CA's obligation to pay a substantial termination fee, are merely in consideration for Coyne's payment of a bona fide wholesale price for CA products.

Enesco asserts that the markup was not a royalty because the Court has no basis for concluding that the markup was anything other than a bona fide wholesale price.  It argues that the Distributor Agreement was negotiated at arm's length by two sophisticated commercial entities.  Additionally, it asserts that the fact that the markup was directly related to the actual purchases by Coyne's from CA further demonstrates that the markup was not a fee paid by Coyne's simply for the right to do or continue doing business with CA.

The question of whether the markup was a reasonable wholesale price or whether it was an indirect franchise fee is a fact-specific inquiry that is not

appropriate on a motion to dismiss.

ii.     **The Minimum Volume Sales Requirement under the Distributor Agreement**

Minimum volume sales requirements "can constitute an indirect franchise fee if the prices exceeded bona fide wholesale prices or if the distributors were required to purchase amounts or items that they would not purchase otherwise." Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 242 (Minn. Ct. App. 1998) (citations omitted).

Enesco argues that the Second Amended Complaint contains no explicit allegation that Coyne's was required to purchase a minimum number of CA products that it would not otherwise have purchased.  The Distributor Agreement obligated Coyne's to order minimum quantities of products except when Coyne's "in its sole and complete discretion . . . shall determine [it has] insufficient initial retail bookings."  (Distributor Agreement § 4.2.)  Thus, Enesco argues, Coyne's was not required to order products from CA that it would otherwise have not have ordered.  Furthermore, Enesco notes, the $5 million sales minimum purchase requirement only applied if the parties could not agree on the Purchasing Plan for any calendar year.  (Id.)

47

The question of whether the "requirements were unreasonable," <u>Upper Midwest Sales Co. v. Ecolab, Inc.</u>, 577 N.W.2d 236, 242 (Minn. Ct. App. 1998), is the type of fact-specific inquiry that is not appropriate on a motion to dismiss.

### iii.     Inventory Purchased Through the Share Agreement

Coyne's also claims that it paid a franchise fee to CA when it became obligated to purchase of inventory from CA under the Share Agreement between Coyne's and CA.  In some cases, "excess inventory can constitute a franchise fee." <u>Wright-Moore Corp. v. Ricoh Corp.</u>, 908 F.2d 128, 136 (7th Cir. 1990).

In opposition to Coyne's assertion, Enesco raises cogent arguments that the inventory was not excess and that the inventory purchase was not a requirement for the execution of the Distributor Agreement.  However, the analysis of this issue is best left for a later stage in this litigation.  At the motion to dismiss stage, Coyne's must merely plead enough to raise its right to relief above a speculative level, and it has done so.

### iv.     Conclusion

In the Court's October 12, 2007 Order denying the motion for a temporary restraining order, based on the evidence before the Court, the Court found that

Coyne's was not likely to prove that it had paid a franchise fee.  However, on this motion to dismiss, limiting review to the Second Amended Complaint and the documents embraced therein, it is plausible that Coyne's could eventually provide evidence that the markups or purchase requirements were unreasonable or not bona fide and were, in fact, indirect franchise fees.  These fact-specific inquiries are not appropriately addressed on a motion to dismiss.  The Court denies the motion to dismiss Count X.

### 2.      Unfair or Inequitable Practice: Count XI

Coyne's asserts that Enesco violated Minn. Stat. § 80C.14 which makes it an "unfair and inequitable practice" for "any person" to "compete with the franchisee in an exclusive territory."  Minn. R. 2860.4400(C).  Coyne's asserts that it is an exclusive distributor of CA in the Territory.  Coyne's alleges that Enesco, with knowledge of Coyne's exclusive rights, notified customers and the relevant market segment that it would be immediately selling CA products in Coyne's exclusive territory.

Enesco asserts that this claim must be dismissed because Coyne's is not a franchisee.  For the reasons explained above, Coyne's has sufficiently alleged that it is a franchisee, so the Court will not dismiss this claim.

49

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

Defendant Enesco's Motion to Dismiss Plaintiff's Second Amended
Complaint [Docket No. 56] is **GRANTED IN PART** and **DENIED IN
PART** as follows:

1.    Count I, interference with contractual relations, **REMAINS** to
      the extent set forth in this Opinion.

2.    Count II, interference with prospective relations, **REMAINS** to
      the extent set forth in this Opinion.

3.    Count III, promissory estoppel, **REMAINS** to the extent set
      forth in this Opinion.

4.    Count IV, federal trademark infringement, is **DISMISSED**.

5.    Count V, federal unfair competition, **REMAINS**.

6.    Count VI, copyright infringement, is **DISMISSED**.

7.    Count VII, deceptive trade practices, **REMAINS**.

8.    Count VIII, misappropriation of trade secrets, **REMAINS** to
      the extent set forth in this Opinion.

9.    Count IX, conversion of goods and good will, is **DISMISSED**.

10.   Count X, violation of the Minnesota Franchise Act,

50

**REMAINS**.

11.     Count XI, unfair or inequitable practice, **REMAINS**.

Dated:   June 21, 2008                          s / Michael J. Davis
                                                Judge Michael J. Davis
                                                United States District Court