# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

COYNE'S & COMPANY, INC.,
a Minnesota corporation,

        Plaintiff,


v.

                              **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 07-4095 (MJD/SRN)


ENESCO, LLC, an Illinois limited
liability company; and COUNTRY
ARTISTS, LTD.;

        Defendants.

_____

Paul L. Ratelle and Thomas A. Forker, Fabyanske Westra Hart & Thomson, PA,
Counsel for Plaintiff Coyne's & Company, Inc.

James V. Garvey and Thomas R. Dee, Vedder Price PC, and Michael J. Steinlage
and Kelly A. Swanson, Larson King, LLP, Counsel for Defendant Enesco, LLC.

_____


## I.     INTRODUCTION

     This matter is before the Court on Plaintiff's Motion for Partial Summary

Judgment [Docket No. 128]; Defendant Enesco, LLC's Motion for Summary

Judgment [Docket No. 130]; Defendant Enesco, LLC's Motion to Exclude Arthur

Cobb's Opinion and Testimony from the Trial of this Matter [Docket No. 132];

and Defendant Enesco, LLC's Motion to Strike the Declaration of Arthur H.

Cobb [Docket No. 167]. The Court heard oral argument on June 28, 2010.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Parties

Plaintiff Coyne's & Company, Inc. ("Coyne's") is a Minnesota corporation

with its principal place of business in Minnesota. Coyne's is a giftware company

that has been in business for over 50 years. It sells various product lines,

including the Country Artists line manufactured by Defendant Country Artists,

Ltd. ("CA").

Defendant CA has its principal place of business in England. The company

sells gift products. CA has been in receivership since August 10, 2007. Former

Defendants Mark Jeremy Orton ("Orton") and Allan Watson Graham

("Graham") are the appointed Receivers of the business assets for the benefit of

creditor Lloyds TSB Bank plc.

Defendant Enesco, LLC ("Enesco") is a U.S.-based company with its

principal place of business in Illinois. Enesco sells giftware and home and

garden decor.  Coyne's and Enesco compete in the giftware market.

## 2. Contracts Between CA and Coyne's

### a. Distributor Agreement

In August 2005, Coyne's and CA entered into a Distributor Agreement.

The interpretation of the Distributor Agreement is governed by the laws of the

United States and of the State of Minnesota.  (Distributor Agreement § 12.4.)

In the Distributor Agreement, CA granted Coyne's

> the exclusive right to sell, distribute, market and advertise certain
> lines of COUNTRY ARTISTS product as described in Exhibit A to
> this agreement and in any derivative products (cumulatively, the
> "Products") for the term of this Agreement . . . for the territory
> consisting of the United States and Mexico (the "Territory") . . . .
> Subject to [certain exceptions,] COUNTRY ARTISTS will not during
> the term of this Agreement either actively sell any Product to any
> person or entity other than COYNE'S within the Territory . . .
> without first obtaining the written consent of COYNE'S such consent
> not to be unreasonably withheld or delayed.

(Id. §  1.1.)  Coyne's was permitted to use CA's trademarks within the Territory

in relation to the Products for the purposes of exercising its rights and

performing its obligations under the Distributor Agreement.  (Id. § 7.2) "Such

rights shall cease immediately upon termination of this Agreement, other than as

is necessary to make sales pursuant to [certain sections]."  (Id.)

3

CA agreed to use its "best efforts to accept orders within ten (10) business days of the receipt of such orders." (Distributor Agreement § 2.2.) CA also agreed to use reasonable efforts to deliver each order within the agreed-upon time period or a within a reasonable time. (Id.) "Ownership of the Products shall not pass to COYNE'S until COUNTRY ARTISTS has received in full (in cash or cleared funds) all sums due to it in respect of the Products." (Id.) CA was to bill Coyne's for its orders upon shipment, and Coyne's agreed to pay the invoice within 30 days of the invoice date. (Id. § 3.7.) According to Coyne's, before August 10, 2007, the custom was that Coyne's received the product from CA and began shipping product to Coyne's customers before Coyne's paid CA for it.

The Distributor Agreement provided that it "commences July 1, 2005 . . . and shall continue until December 31, 2007 unless terminated early or extended through procedures pursuant to the provisions herein." (Distributor Agreement § 5.1.) If Coyne's met its sales obligations to sell $5 million or 5% above the previous year's sales, whichever is greater, for the 2007 calendar year, it had the option to extend the Distributor Agreement to December 31, 2008. (Id. § 5.3.) The extension had "to be exercised by COYNE'S in writing no later than 31 December 2007." (Id.)

The Distributor Agreement also contained a termination provision based on either party's insolvency.  (Distributor Agreement § 5.4.)  Specifically, either party could serve upon the other party written notice to terminate the agreement if the other party became insolvent, filed a bankruptcy petition, made a general assignment for the benefit of its creditors, or had a receiver or trustee appointed for its business or properties; or if the other party committed a material breach of the agreement.  (Id.)

In the event that CA terminated the Distributor Agreement without cause and before the expiration date set forth in the contract, CA was required to repurchase all CA Product from Coyne's, reimburse Coyne's for its reasonable costs incurred in ceasing distributor operations, and pay Coyne's the greater of $1.5 million or 20% of gross sales of the Products during the previous twelve months.  (Distributor Agreement § 6.1.)

The prices for CA products sold to Coyne's were based on a markup of 50%.  (Distributor Agreement § 3.1.)  The Distributor Agreement contained a "minimum sales" requirement that, for any calendar year, Coyne's was to sell the greater of $5 million or 5% over the prior year's sales.  (Id. § 4.2) Coyne's did not achieve these sales during its first full year of distribution, 2006, but CA imposed

no penalty.

**b.    Share Agreement**

At the same time that CA and Coyne's entered into the Distributor Agreement, they also entered into an agreement for Coyne's to purchase CA's business in the United States ("Share Agreement").  Under the agreement, Coyne's agreed to pay $989,097 for the Shares of Country Artists USA, Inc. (Share Agreement § 2.2.)  In fact, after negotiation, Coyne's only paid approximately $700,000 for shares and inventory.  By no later than August 2007, Coyne's had sold off all the inventory acquired under the Share Agreement, selling some at a discount.

**3.    Asset Sale Agreement Between CA and Enesco**

On August 10, 2007, Orton and Graham were appointed as Receivers for CA.  Orton and Graham immediately entered into an Asset Sale Agreement with Enesco.  Pursuant to the agreement, CA sold Enesco "such right, title and interest as it may have in the Business and Assets . . . on the basis that it is a transfer of the Business as a going concern to [Enesco]."  (Asset Sale Agreement § 1.2.) Enesco also bought CA's intellectual property and inventory.  (Id. § 2.1, 3.1, 4.2) Enesco did not assume CA's liabilities.  (Id. §§ 3.2, 14.6.)

The asset sale did not include any products which left CA's facilities in

Wellesbourne, United Kingdom, "in the course of delivery to customers" by

August 10, 2007. (Asset Sale Agreement, Sched. 4 § 6.) However, there is no

evidence that, as of August 10, 2007, there was any product in transit from CA's

United Kingdom facility to Coyne's. The asset sale also did not include any

assets owned by a third party. (Id. Sched. 4 § 16.)

The Asset Sale Agreement further stated that "no assurances, warranties or

representations as to [CA's] right, title or interest in any of the Assets are given

and that the risk of good title not passing hereunder to [Enesco] is [Enesco's]."

(Id. § 1.3.)

Finally, CA and its Receivers "agree and undertake to serve by fax between

9 a.m. and 10 a.m. on Monday 13 August 2007 the Termination Notices on all of

the relevant parties to the Distribution Agreements." (Asset Sale Agreement

§ 5.1.4.)

### 4. Enesco and Coyne's Relationship Following the Asset Sale Agreement

On August 21, the Receivers sent Coyne's a letter stating that they had

been appointed receivers for CA on August 10. They stated: "We hereby give

you notice under Clause 5.4 of the Agreement that we are terminating the Agreement with immediate effect." (Aug. 21, 2007 Letter.) Enesco did not discuss the content of the Coyne's termination letter with the Receivers.

On August 23, 2007, Coyne's notified the Receivers that the letter terminating the Distributor Agreement was not in accordance with the terms of the Distributor Agreement and that "the notice was a nullity." Specifically, Coyne's claimed that § 5.4 permitted one party to terminate when the other party becomes insolvent; it does not permit the insolvent party itself to terminate the Distributor Agreement.

After Enesco purchased CA, it hired CA employees such as Tracey Talis and David Blakeman.

On August 13, 2007, Enesco President and CEO Basil Elliott and Chairman Matthew Bousquette called Coyne's President Michael Coyne to discuss Enesco's acquisition of CA. Bousquette informed Coyne that he did not have a "predetermined plan for the USA market," and that Enesco wanted to work together on an "amicable plan." (M. Coyne Dep. 222-23.)

After the telephone call, Elliott emailed others within Enesco and stated that CA was about 40% of Coyne's U.S. volume. (Aug. 13, 2007 Basil Elliott Email

to Ken Johnson.)  He commented, "This is going to really hurt Coynes!  I think it could get messy once he [Michael Coyne] realizes he's out."  (Id.)  Elliott noted that, during the conversation with Coyne, Bousquette "left the door open at this point by not commenting on our strategy to take over US sales and distribution asap."  (Id.)

On August 13 and thereafter, Bousquette asked Coyne's for information regarding its CA sales, such as inventory information, account open purchase orders, on-hand inventory, CA sales etc.  Enesco was interested in the information in order to figure out what to do with CA products in the U.S. market and to develop its CA marketing plan.  (Guarisco Dep. 67-71.)  Enesco expected that it "would probably purchase some of [Coyne's] inventory and then if they wanted to also work with us as some kind of an expertise in the industry, because this was a product line we did not know, we felt we could work something out with them on that basis."  (Id. 67-68.)

On August 22,Coyne's and Enesco signed a Mutual Nondisclosure Agreement ("NDA").  The NDA was written by Coyne's attorney.  The NDA provided that the parties agreed "not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions

concerning a business relationship between the parties." (NDA § 3.) The "business relationship" is not defined beyond stating that "[t]he parties wish to preliminarily explore a business opportunity of mutual interest." (Id. § 1.) The NDA states that it "contains the entire agreement between the parties with respect to the subject matter hereof." (Id. § 8.)

Coyne's continued to provide information requested by Enesco. Internally, Enesco made negative comments about Coyne's business propositions.

After Coyne's learned that Enesco had purchased CA, it began repeatedly requesting release of its shipping documents so that the CA product that Coyne's had ordered by August 10, 2007, could be released to Coyne's. (See, e.g. Aug. 22, 2007 Coyne's Email to Enesco ("Please confirm that our shipping documents along with the remaining product will be released.").) During this time, Enesco directed its employees to not release any product or place any orders for Coyne's. (See, e.g., Aug. 14, 2007 Bousquette Email to Enesco Employees (instructing Enesco employees to "[h]old all other shipments" of Coyne's).)

By September 3, 2007, Enesco approved for release to Coyne's all CA products for which Coyne's had paid CA as of August 10, 2007. (Aug. 31, 2007, Enesco Chief Accounting Officer Tony Testolin Email to Enesco Employees.)

Enesco informed its employees: "We are continuing to discuss the other shipments and will notify instruct [sic] you as soon as we can." (Id.)

Coyne's continued to request release of the other orders and shipping documents, emphasizing that it needed to fill customer orders and that its marketplace credibility was deteriorating. On September 13, Testolin, told Coyne's that he would email the shipping documents the next morning, but then informed Coyne's that, in fact, discussions between Enesco and Coyne's had stalled, so he would not send the documents. On September 20, Enesco informed Coyne's freight forwarder, C.H. Robinson International Inc., that it would need to divert certain CA containers that had been shipped to Coyne's to Enesco.

On September 21, 2007, Enesco issued a press release stating that it would begin distributing CA products in the U.S. beginning with its upcoming show at Enesco Headquarters. By early October 2007, Enesco had returned all information provided by Coyne's under the NDA. Enesco claims that it only used the information for consideration of a potential business relationship with Coyne's and to ensure that it released the products that Coyne's had paid for.

By November 2007, Enesco had transported 42,000 pieces of CA products that had been ordered by Coyne's to its own distribution center and put an

Enesco label over each Coyne's label.

### 5. CA's Previous Supply Problems

Before it fell into receivership, CA had other problems meeting its

obligations. For instance, in 2006 and early 2007, due to factory problems, it was

only able to deliver about 40% of orders placed and could not meet all of Coyne's

purchase orders. CA's inability to fill Coyne's orders hurt Coyne's sales in 2007.

Because of this, some Coyne's customers cancelled orders, some expected a

discount, and some possibly stopped doing business with Coyne's altogether.

Coyne's goodwill suffered and CA's delivery problems had an "extremely

critical" financial effect on Coyne's. (July 6, 2007 Coyne's Letter to CA).

Coyne's own fill rate for its customers' orders for CA products from Fall

2006 through August 2007 was between 40% and 60%.

### 6. Alleged Extension of the Distributor Agreement

Its interrogatory answers, Coyne's averred that it did not take action as

specified under the Distributor Agreement to extend that agreement. (Coyne's

Answers to Defendant's First Set of Interrogatories at 4.) Specifically:

> **<u>INTERROGATORY 2</u>**: State whether Coyne's extended the
> Distributor Agreement with Country Artists for any period of time
> beyond December 31, 2007. If so, state when and the manner in

which (e.g., by written or oral notification) Coyne's purportedly did so. If not, state why not.

**ANSWER**: Coyne's & Company was involved in talks with Country Artist[s] to extend the Distribution Agreement beyond the December 31, 2007 date. The conversations were between Michael Coyne and Simon Ashton via email, letter, and telephone conversations. A meeting was scheduled for September 10, 2007 in Minneapolis to discuss among other things, the contract extension.

(Id.)

There is no evidence in the record that Coyne's provided anything in writing to CA to extend the Distributor Agreement before December 31, 2007. However, in early 2007, Coyne's had started planning the Coyne's CA line for 2008 with CA. On August 15, 2007, after Enesco told Coyne's of its acquisition of CA, Coyne's notified Enesco that it wanted to "exercise [its] rights and extend the exclusive Distribution Agreement of the C/A lines thru 12-31-2008." (Aug.15, 2007 Michael Coyne Email to Elliott.)

### 7. Coyne's Lost Customers

Coyne's provides evidence of three specific customers of its CA products cancelling orders with Coyne's. From August 2007 through December 2007, Coyne's made net sales of CA products of approximately $916,820. In 2008, it made net sales of $611,290. From January 2009 through April 2009, it made net

sales of $9,410.  In 2007, Enesco invoiced a total of $79,901 in CA product sales.

### 8. Cobb Report

Coyne's expert, Arthur H. Cobb, opines that Coyne's is entitled to damages from Enesco for lost profits, loss of customer goodwill and development costs.

Cobb's Report was issued on November 2, 2009.  Cobb is a certified public accountant and president of Cobb & Associates, who has conducted engagements regarding the distribution and sale of giftware and related products.  Enesco did not take Cobb's deposition.

Coyne's has designated Cobb as its damages expert with regard to six categories of damages: 1) lost profits through December 31, 2007; 2) lost profits on disposition of inventory; 3) unsold inventory; 4) lost profits for 2008; 5) lost goodwill; and 6) development costs.  He provides analysis and opinions related to the first four categories of damages.  Cobb does not offer damages opinions on the last two categories – lost goodwill and development costs.

### B. Procedural History

On September 26, 2007, Coyne's filed a Complaint against Defendant Enesco.  On September 27, 2007, Coyne's filed a motion for a temporary restraining order.  On October 4, 2007, Coyne's filed an Amended Complaint

against Enesco.

The Court denied Coyne's motion for a temporary restraining order on October 12, 2007. On January 23, 2009, the Eighth Circuit Court of Appeals affirmed this Court's denial.

On December 8, 2007, Coyne's filed its Second Amended Complaint against Defendants Enesco, CA, Orton, and Graham. In the Second Amended Complaint, Coyne's alleges: Count 1, interference with contractual relations by Enesco; Count 2, interference with prospective relations by Enesco; Count 3, promissory estoppel by Enesco; Count 4, federal trademark infringement in violation of the Lanham Act § 32, 15 U.S.C. § 1114, by Enesco; Count 5, federal unfair competition in violation of the Lanham Act § 43, 15 U.S.C. § 1125(a), by Enesco; Count 6, copyright infringement under 17 U.S.C. § 501 by Enesco; Count 7, violation of Minn. Stat. § 325D.44, deceptive trade practices, by Enesco; Count 8, violation of Minn. Stat. § 325C.01, misappropriation of trade secrets, by Enesco; Count 9, conversion of goods and good will by Enesco; Count 10, violation of the Minnesota Franchise Act by all Defendants; Count 11, unfair or inequitable practice in violation of Minn. Stat. § 80C.14 by Enesco and the Receivers; Count 12, breach of contract by CA and the Receivers; and Count 13, rescission of Share

Purchase Agreement by CA and the Receivers.

On June 21, 2008, the Court granted in part and denied in part Enesco's

motion to dismiss the claims against it.  [Docket No. 78]  It dismissed Count 4,

federal trademark infringement; Count 6, copyright infringement; and Count 9,

conversion of goods and good will.

On September 9, 2008, the Clerk's Office entered default against CA.

[Docket No. 98]

On October 22, 2009, the Court dismissed all counts against

Defendants/Receivers Orton and Graham.  [Docket No. 100]

## III.    DISCUSSION

### A.    Defendant's Motion to Strike the Declaration of Arthur H. Cobb [Docket No. 167]

Enesco has moved to strike the Declaration of Arthur H. Cobb, Coyne's

expert, filed in April 2010.  [Docket No. 162]  Based on the Third Amended

Pretrial Scheduling Order [Docket No. 122], the deadline for Coyne's to disclose

its expert reports was November 1, 2009.   Enesco moves to strike the Cobb

Declaration under Federal Rule of Civil Procedure 26(a)(2)(B) on the grounds that

it is an untimely attempt to supplement the Cobb Report.

Coyne's retorts that it did comply with Rule 26(a) by providing Cobb's written report on time and containing all of the items required by the rule. It further asserts that the Cobb Declaration is not an attempt to supplement Coyne's expert disclosure. It was simply provided to the Court in order to give the Court an attested copy of Cobb's report in response to Enesco's argument that the Court should not consider an unattested report when ruling on the summary judgment motion.

The Court has carefully reviewed the Cobb Report and the Cobb Declaration and concludes that, contrary to Enesco's arguments, the Cobb Declaration does not contain materially new information. Addressing Enesco's two main objections, the Court concludes that the Cobb Report did identify conversations with Coyne's representatives as a source of Cobb's information, so representations in the Cobb Declaration regarding conversations with Coyne's management were not material new information. As to Enesco's allegation that its web site and SEC filings do not contain the information Cobb claims – an allegation Enesco has failed to support with evidence – that is a matter for cross examination. Defendant's Motion to Strike is denied.

**B.     Defendant's Motion to Exclude Arthur Cobb's Opinion and**

**Testimony from the Trial of this Matter [Docket No. 132]**

1.      **<u>Daubert</u> Standard**

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702.  The proponent of the testimony has the burden to show by a

preponderance of the evidence that the testimony is admissible under Rule 702.

<u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681, 686 (8th Cir. 2001).  Under the Rule:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in <u>Daubert</u>, trial courts must serve as

gatekeepers to insure that proffered expert testimony is both relevant and

reliable.  Trial courts are given broad discretion in fulfilling this gatekeeping role

. . . ."  <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (citations

omitted).  The proposed testimony must be useful to the factfinder; the expert

witness must be qualified; and the proposed evidence must be reliable.  <u>Lauzon</u>,

270 F.3d at 686.

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

## 2. The Parties' Arguments

Enesco does not dispute Cobb's qualifications. Rather, it argues that 1) his opinions are simply rudimentary math, which fail to address alternative explanations for Coyne's losses; 2) he failed to corroborate sales and other data contained in Coyne's Answers to Interrogatories, upon which he relied, although they are materially different from the business records Coyne's produced in discovery; and 3) he failed to offer an opinion on goodwill and development costs.

Coyne's argues that Cobb does not need to opine on liability or causation, because he is only rendering opinions on damages. It concludes that, at most, Enesco's arguments go to the weight, not the admissibility, of Cobb's testimony.

### a. Cobb's Methods

Enesco argues that Cobb's lost-profits analyses are not the products of reliable methods, but are overly simplistic calculations that leave an analytic gap between the data (Coyne's lost profits) and the opinions being offered (that Enesco is the sole and exclusive cause of all of Coyne's alleged lost profits). However, Cobb is not an expert on liability, so he is not required to explain the legal theory for Enesco's alleged liability for Coyne's damages.

Enesco also claims that Cobb's methods are too simple and that he fails to account for relevant facts and alternative explanations. When calculating 2008 lost profits, he fails to include such lost profits concepts as incremental costs beyond "selling costs," the risks and uncertainty of realizing actual sales (and discount factors associated therewith), competition, supply chain disruptions, general economic conditions, and the impact of currency fluctuations. He ignores the worldwide economic crisis of 2008 and the bad state of Coyne's relationship with CA in the 2006-07 timeframe. Enesco also argues that, here, Cobb fails to include any discussion of causation or alternative factors. Enesco concludes that this overly simplistic calculation is unreliable and inadmissible.

The Court agrees that Cobb's analysis is simple and does not address a number of apparently relevant factors. However, Cobb's analysis is not so

fundamentally unsound as to offer no assistance to the jury.  Enesco can attack his methods on cross examination.

### b.      Whether Cobb Relied on Invalid Data

Enesco argues that there are material differences between Coyne's Answers to Interrogatories, upon which Cobb relied, and Coyne's actual business records related to historic net sales, which require rejection of Cobb's testimony. The Court rejects this argument.  There is a sound argument to be made on either side regarding the accuracy of the Answers to Interrogatories.  In Coyne's favor, Coyne's CFO, Carl Guggenberger, testified that the net sales information contained in Coyne's interrogatory answers are an accurate reflection of Coyne's sales of CA product.  Also, the accuracy of the cited "business records" is disputed, as Guggenberger testified the documents might be inaccurate, early drafts, prepared with incomplete data.  The fact that the information on those two pages differs from the net sales information in Coyne's interrogatory answers does not establish that the basis for Cobb's opinions is so unreliable that his testimony should be excluded.  It is for the jury to decide the accuracy of the facts upon which Cobb relied.  Enesco can cross examine on this point.

As to the remainder of Enesco's arguments regarding the foundation of

Cobb's testimony, the Court notes that Cobb was not required to independently verify all of the underlying records. See, e.g., EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000) (upholding admission of economist's damages calculation based on information from plaintiff regarding revenue).

The Court again notes that, generally, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Bonner, 259 F.3d at 929-30 (citation omitted). Any weakness in the basis for Cobb's testimony can be addressed on cross examination.

### c. Goodwill and Development Costs

Enesco points out that Cobb's report fails to provide an opinion regarding Coyne's loss of customer goodwill and development costs and, therefore, should be excluded. The time for Cobb to supplement his report has passed. Coyne's has represented to the Court that Cobb will not testify on these issues, and Cobb offers no quantifiable loss opinion. Therefore, any testimony by Cobb regarding loss of goodwill and development costs is excluded.

### C. Summary Judgment Motions

Enesco seeks summary judgment on all of the claims against it. In the

alternative, Enesco seeks partial summary judgment limiting Coyne's claims for damages.

Coyne's opposes Enesco's motion and brings its own motion for partial summary judgment, seeking summary judgment in its favor on Count 1, interference with contractual relations; Count 2, interference with prospective relations; Count 5, federal unfair competition; Count 7, deceptive trade practices; and Count 8, misappropriation of trade secrets. Coyne's does not seek summary judgment on Count 3, promissory estoppel; Count 10, violation of the Minnesota Franchise Act; or Count 11, unfair or inequitable practice.

### 1.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### 2. Count 1: Interference with Contractual Relations

#### a. The Claim

Based on the Court's June 21, 2008 Order on Enesco's Motion to Dismiss, this claim is limited to the Distributor Agreement and "the individual contracts Coyne's claims with its customers based on the allegation that Enesco caused CA to refuse to release the shipping documents." (June 2008 Order at 25.)

#### b. The Elements

Under Minnesota law, a claim for tortious interference with contractual relations requires a showing of "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 900 (Minn. 1982) (citation omitted).

#### c. The Distributor Agreement

##### i. Existence of Contract: Termination of the Distributor Agreement

The Receivers terminated the Distributor Agreement by sending Coyne's written notice. After that point, there was no contract for Enesco to interfere with. The Court has already ruled that "the Receivers did not adopt the

Distributor Agreement . . . did not accept performance of the contract by Coyne's or accept any benefits of the Distributor Agreement." ([Docket No. 100] at 21.) There is no authority to support Coyne's argument that Enesco's engagement of CA employees kept the Distributor Agreement in effect or caused Enesco to assume CA's obligations.

Coyne's argues that the Receivers failed in their attempt to terminate the Distributor Agreement for cause through the August 21, 2007 notice because § 5.4 of the Distributor Agreement only allowed Coyne's to terminate based on CA's insolvency; it did not permit CA or the Receivers to terminate the Agreement based on CA's insolvency. Even if the Receivers did not have cause to terminate the Distributor Agreement under § 5.4, the Distributor Agreement was terminable subject to CA's obligations for a termination "without cause and prior to the expiry date." (Distributor Agreement § 6.1.) CA's obligations for such a without-cause termination included repurchase of product, reimbursement of costs, and payment of $1.5 million. (Id.) However, CA did not meet these obligations because it was insolvent, and Enesco is not liable for CA's failure to meet them.

ii.    Enesco's Lack of Obligation to Deliver

**Product for Which Coyne's Had Not Paid**

Coyne's further argues that, because Enesco acquired CA's assets on an ongoing concern basis, those assets remained subject to CA's obligations to third parties, such as Coyne's. It argues that, therefore, Enesco purchased CA and the products ordered by Coyne's, but not yet paid for, with the obligation to deliver those products to Coyne's. The fact that the Asset Sale Agreement stated that CA's business was sold "as a going concern" does not alter the Court's conclusion, because the Asset Sale Agreement further provided that the sale as a going concern was "[s]ubject to the terms of this Agreement." (Asset Sale Agreement § 3.1) The Asset Sale Agreement clearly provided that "[n]othing in this Agreement shall operate to transfer any assets or rights or liabilities or obligations of the Vendor other than those specifically referred to in clause 3.1." (Id. § 3.2.) Enesco did not take on the Distributor Agreement as an asset or liability. Additionally, § 14.6 of the Asset Sale Agreement, in conjunction with § 2.1, provides that, except for as expressly provided in the agreement, "nothing in this Agreement shall cause [Enesco] to become liable for the Liabilities," which includes "all liabilities or obligations of [CA] or the Receivers relating to the Business or Assents and . . . arising out of any contractual arrangements entered

into prior to [August 10, 2007]."

Because CA had title to all CA product for which Coyne's had not paid as of August 10, 2007, that product was purchased by Enesco under the Asset Sale Agreement. Because CA did not own that product, neither CA nor its Receivers had the right or the ability to deliver it to Coyne's.

The Court further rejects Coyne's assertion that the course of performance between Coyne's and CA, two merchants, altered the terms of the Distributor Agreement with regard to ownership of the Product. See Minn. Stat. § 336.1-303(f) ("Subject to section 336.2-209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."); Minn. Stat. § 336.2-209, subd. 2 (providing that as between merchants, a "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded"); (Distributor Agreement § 12.12 (providing that Distributor Agreement may only be amended by written consent)).

Coyne's asserts that CA's reservation of title under the Distributor Agreement does not mean that CA owned products ordered by Coyne's or Coyne's had no rights in these products. The Court disagrees. Section § 2.2 of

the Distributor Agreement is unambiguous: "Ownership of the Products shall not pass to COYNE'S until COUNTRY ARTISTS has received in full (in case or cleared funds) all sums due to it in respect of the Products."

### iii.    Intentional Procurement of the Breach

Enesco did not interfere with the Distributor Agreement because CA did not own any products not paid for as of August 10, 2007.  (There were no products in transit from CA's United Kingdom facility to Coyne's, so the in-transit exception contained in the Asset Sale Agreement does not apply.)  As this Court previously held, Enesco acquired ownership of all CA products not yet paid for by Coyne's as of August 10.  (June 2008 Order at 41.)  Section 2.2 of the Distributor Agreement only requires that CA "use reasonable endeavours to deliver each of Coyne's orders . . . within a reasonable time," and states that "time of delivery shall not be of the essence."  It further states that CA will "advise Coyne's as soon as reasonably practicable of any known, likely or possible inability to make full and timely delivery of any Products which Coyne's has previously ordered."  CA's receivership and asset sale rendered it unable to deliver product not paid for by Coyne's as of August 10th.  Enesco's later refusal to release shipping documents did not prevent CA from delivering the ordered

products.  Any breach of the delivery terms was caused by CA, not Enesco.

By September 3, 2007, Enesco had approved the release of all CA product for which Coyne's had paid as of August 10, 2007.  Enesco could not have interfered with a contract between Coyne's and CA with respect to product that neither CA nor Coyne's owned.

Finally, there is no evidence that Enesco instructed CA to divert Coyne's orders to Enesco.  In the Complaint, Coyne's alleged that it requested the shipping documents from CA and CA stated that Enesco had directed CA not to release them, in violation of CA's delivery obligations under the Distributor Agreement.  However, these are no longer the facts before the Court.  Instead, the record demonstrates that Enesco, itself, refused to release the shipping documents for products that Enesco owned.  This distinction is key because while, under the Distributor Agreement, CA had a contractual obligation to ship product in a reasonable time after Coyne's ordered it, Enesco had no such obligation.  The product not yet paid for was owned by CA.  Therefore, Enesco purchased it when it signed the Asset Sale Agreement.  It had no obligation to provide that product to its competitor.  And there is no evidence that it induced CA to breach its promise to deliver that product to Coyne's.

As of August 10 2007, CA was insolvent. The Receivers had taken control of its inventory and promptly sold it. Therefore, there was no possibility of CA performing under any agreement, regardless of Enesco's actions. The Receivers and CA terminated or failed to adopt the Distributor Agreement. CA may have violated the Distributor Agreement further by not fulfilling its obligations under § 6.1 for without-cause terminations. However, there is no evidence that Enesco's actions of blocking release of the shipping documents for product it owned was the cause of CA's breach of the Distributor Agreement.

### iv.    Justification

Even if Enesco's actions could be viewed as meeting the other elements of an intentional interference claim, the claim would fail because Enesco's actions were justified.

The burden of proving justification is on Enesco. <u>Kjesbo v. Ricks</u>, 517 N.W.2d 585, 588 (Minn. 1994). "There is no wrongful interference with a contract where one asserts in good faith a legally protected interest of his own . . . believ[ing] that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." <u>Id.</u> (citation omitted).

By retaining CA product not paid for by Coyne's (and the shipping

documents for that product), Enesco was exercising its legal right of possession as owner of the product purchased from the Receivers and CA under the Asset Sale Agreement. Releasing the product or shipping documents would have impaired Enesco's interest in the product it had purchased. Its actions were justified. See Kemp v. Tyson Foods, Inc., No. CIV 96-173 JRT/RLE, 2001 WL 391552, at *7 (D. Minn. March 31, 2001) (granting summary judgment to defendant on tortious interference claim when no evidence that defendant acted in bad faith attempting to protect its legal interest).

### c.  Contracts Between Coyne's and Its Customers

As set forth with regard to the claim for interference with the Distributor Agreement, the Court holds that Enesco was justified in taking possession of the product Coyne's had not yet paid for and in failing to release the shipping documents to Coyne's. Additionally, it was CA's insolvency and the Receivers' sale of CA's assets to Enesco that caused Coyne's to breach its delivery obligations, if any, to its customers.

Independent of the above discussion, Coyne's has presented no evidence sufficient to reach a jury that it had contracts with its customers with which Enesco could interfere. Generally, a purchase order is merely an offer to enter

into an agreement. Reid v. Nw. Implement & Wagon Co., 82 N.W. 672, 672-73 (Minn. 1900); see also Cogent Computer Sys., Inc. v. Turbochef Techs., Inc., C.A. No. 06-280S, 2008 WL 219343, at *10 (D.R.I. Jan. 24, 2008) (finding, under U.C.C., that purchase order was offer to make contract); Bio-Tech Pharmacal, Inc. v. Int'l Bus. Connections, LLC, 184 S.W.3d 447, 450 (Ark. Ct. App. 2004) ("[A] purchase order is generally considered an offer.") (citations omitted). There are circumstances in which a purchase order can constitute acceptance of a contract, such as when there had been a prior oral offer; however, there is no evidence that such circumstances existed in this case.

Coyne's points to no evidence that it had contracts with, rather than merely offers from, its customers for CA product. The evidence before the Court is that Coyne's customers submitted purchase orders and Coyne's invoiced for those orders only when product shipped. Additionally, purchase orders had a "cancel date" – i.e., the date an order would automatically cancel if the product did not ship. If Coyne's did not ship, it did not invoice. Coyne's admits that it did not invoice or ship all orders for which it received purchase orders. This evidence can only support the finding that Coyne's customers' orders were offers. Therefore, Coyne's alleged inability to deliver CA product to the identified

customers did not constitute a breach of any contract.  See CyberOptics Corp. v. Yamaha Motor Co., Ltd., Civ. No. 3-95-1174, 1996 WL 673161, at *19 (D. Minn. July 29, 1996) (holding that the "absence of an actual breach of a contract is fatal" to an interference claim).  Viewing the evidence in the light most favorable to Coyne's, there is insufficient evidence in the record to establish formation of contracts with customers that were breached by Coyne's.  Therefore, the Court enters summary judgment for Enesco on the interference with customer contracts claim.

### 3.  Count 2: Interference with Prospective Relations

#### a.  The Claim

Based on the Court's June 2008 Order, this claim is limited to the allegation that Enesco "wrongly caused CA to refuse to release the shipping documents to Coyne's, preventing Coyne's from fulfilling customer orders."  (June 2008 Order at 26-27.)

#### b.  The Elements

In Minnesota, a party "intentionally and improperly interferes with another's prospective business relation by (1) inducing a third person not to enter into or to continue the prospective relations; or (2) preventing the other from

continuing the prospective relationship." <u>Hough Transit, Ltd. v. Nat'l Farmers Org.</u>, 472 N.W.2d 358, 361 (Minn. Ct. App. 1991)(citation omitted). The act must be committed without legal justification. <u>Midway Manor Convalescent & Nursing Home, Inc. v. Adcock</u>, 386 N.W.2d 782, 788 (Minn. Ct. App. 1986).

As the Court explained above, the record does not support the allegation that Enesco caused CA to refuse to release shipping documents to Coyne's. Instead, after Enesco purchased the product from the Receivers, Enesco refused to release shipping documents to Coyne's for product now owned by Enesco. Enesco acted within its legal rights to hold the product it owned – and Coyne's had not yet paid for – even if that negatively impacted Coyne's ability to fill customer orders and continue customer relationships into the future. As explained with respect to Count I, Enesco's actions were justified. Therefore, Enesco is entitled to summary judgment on this claim.

Furthermore, Coyne's had no reasonable expectation that its prospective relations with its customers would continue as to CA products after CA went into receivership and the Distributor Agreement was either terminated or not assumed by the Receivers. CA's actions, not Enesco's, caused Coyne's harm. <u>See Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.</u>, 811 F. Supp. 1372, 1382 (D.

34

Minn. 1993) (holding that, after termination of manufacturer representative agreement, plaintiff "had no reasonable basis for its expectation that any prospective contracts would survive its termination") (footnote omitted); see also Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 610, 613 (8th Cir. 1998) (holding that, when distribution relationship ended, new importer did not act wrongfully by dealing with others).

### 4. Count 3: Promissory Estoppel

#### a. The Claim

Based on the Court's June 2008 Order, this claim is limited to "the extent that Count III is based on Enesco's alleged promise to assist in obtaining shipping documents, as pled in Paragraphs 40 and 54" of the Second Amended Complaint. (June 2008 Order at 28-29.)

#### b. The Elements

"The application of promissory estoppel requires the analysis of three elements: 1. Was there a clear and definite promise? 2. Did the promisor intend to induce reliance, and did such reliance occur? 3. Must the promise be enforced to prevent an injustice?" Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995) (citation omitted). Whether a promise must be enforced to prevent

an injustice is a question of law.  See Servais v. T.J. Mgmt. of Minneapolis, Inc.,

973 F. Supp. 885, 898 (D. Minn. 1997).

### c.      Clear and Definite Promise

Coyne's argues that Enesco promised that it would release all shipping

documents for CA product ordered by Coyne's in exchange for Coyne's

confidential business information.  Michael Coyne and Carl Guggenberger both

participated in the initial August 22, 2007 meeting with Enesco and testified to

their understanding of this commitment, although both admitted that there was

no explicit promise either orally or in the NDA.  The record reveals that each

Coyne's representative testified that Enesco never "promised" to deliver all

product ordered as of August 10th.  Coyne's fails to cite to any clear statement by

Enesco that it would deliver CA product not yet paid for by Coyne's.  Coyne's

merely cites to its own representatives' understanding that this would occur.

Coyne's own representatives, such as Guggenberger, testified that there was no

clear promise, but that they understood that they would get delivery because that

was just how business had been done with the CA line.

The record is devoid of evidence of a clear and definite promise by Enesco

that it would deliver the shipping documents to Coyne's if Coyne's provided its

confidential information. According to Coyne's, Enesco gave the impression that it was considering release and that the confidential information was a prerequisite. But there is simply no clear promise to release shipping documents in exchange for information.

Moreover, the information was disclosed pursuant to the NDA, drafted by Coyne's, which contained no such quid pro quo. The NDA contains an integration clause and does not obligate Enesco to release any CA product.

Based on the lack of a clear and definite promise, this claim is subject to dismissal.

### d.	Reliance

Additionally, there is no evidence that Coyne's took any action in reliance on Enesco's perceived promise, except, perhaps that it turned over its business information in the hope of obtaining shipping documents. As previously noted, however, Coyne's turned over this information pursuant to the NDA, which provided for no such promise by Enesco. There is no evidence that Coyne's was damaged by turning over this information, because, as explained below with respect to the misappropriation of trade secrets claim, there is no evidence that Enesco used the information, and Enesco has since returned the information.

There is no evidence that Coyne's took any other actions in reliance such as accepting new customer orders for unallocated product that was subject to any Coyne's open purchase order as of August 10, 2007.  See, e.g., Lappen v. Genuia Garment Int'l, Inc., No. Civ. 03-6110, 2005 WL 348360, at *5 (D. Minn. Feb. 9, 2005) (holding no reliance when plaintiff continued to act as he had "prior to any written contract negotiations").

Therefore, because there is no evidence of a clear and definite promise by Enesco and because there is no evidence of reliance by Coyne's, Enesco is entitled to summary judgment on Count 3.

### 5.    Count 5: Federal Unfair Competition

#### a.    The Claim

Coyne's claims that Enesco misappropriated Coyne's rights of exclusivity and advertising in the marketplace.  Coyne's asserts that Enesco exploited the intellectual property rights granted exclusively to Coyne's by competing with Coyne's in the exclusive Territory.  Enesco allegedly disparaged Coyne's business through false representations and caused confusion between Coyne's status as the exclusive distributor of the CA product line and Enesco's own public claims to that status.

**b.      Elements**

Coyne's asserts that Enesco violated the Lanham Act § 43(a)(1)(A), which

provides that

> [a]ny person who, on or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false
> or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as
> to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his or
> her goods, services, or commercial activities by another person . . .
>
> * * *
>
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

"In a false designation of origin claim, a plaintiff must show a likelihood of

confusion between trademarks."  Auto-Chlor Sys. of Minn., Inc. v. Johnson

Diversey, 328 F. Supp. 2d 980, 1018 (D. Minn. 2004) (footnote and citation

omitted).  To the extent Coyne's seeks money damages, it is "required to prove

actual confusion, [Enesco's] intent to cause that confusion, and a causal

connection between the confusion and the injury suffered."  St. Croix Printing

Equip., Inc. v. Sexton, 578 F. Supp. 2d 1195, 1198 (D. Minn. 2008) (citations omitted).

### c. Ownership of CA Trademarks

A trademark owner cannot be sued under § 1125(a) because the owner is the originator of the trademarks. See, e.g., Westowne Shoes, Inc. v. Brown Group, Inc., 104 F.3d 994, 997 (7th Cir. 1997) ("While a trademark licensee (at least if he has an exclusive license), as well as the trademark's owner, can sue to protect the trademark from infringement, he cannot sue the trademark owner for 'infringing' the trademark. There is no basis in either the federal or the state law of unfair competition for such a claim.") (citations omitted); Auto-Chlor Sys. of Minn., Inc., 328 F. Supp. 2d at 1019 (holding that a trademark owner cannot be sued under the Lanham Act § 1125(a) by a licensee, even when owner made a "concerted effort" to confuse the plaintiff's customers that defendant and plaintiff were the same because "there can be no confusion as to origin because [defendant] was the originator of the trademark"). Instead, a licensee must seek redress based on the violation, if any, of its licensing agreement.

It is undisputed that Enesco owns the CA trademarks. Because it is the originator of the trademarks, there can be no confusion as to the mark, even if

40

Enesco violated a licensing agreement.  <u>See, e.g.,</u> <u>MJ & Partners Rest. Ltd. P'ship</u>

<u>v. Zadikoff</u>, 10 F. Supp. 2d 922, 926-28 (N.D. Ill. 1998) (gathering cases).

Enesco is entitled to summary judgment on Count 5.

### 6.    Count 7: Minnesota Deceptive Trade Practices Act

Claims for deceptive trade practices are analyzed under the same rubric as

claims under the federal Lanham Act.  <u>DaimlerChrysler AG v. Bloom</u>, 315 F.3d

932, 936 n.3 (8th Cir. 2003).  For the reasons set forth with respect to Count 5,

Enesco is entitled to summary judgment on Count 7.

### 7.    Count 8: Minnesota Trade Secrets Act

#### a.    The Claim

Based on the Court's June 2008 Order, this claim is limited to the allegation

"that Enesco acquired confidential information from Coyne's using improper

means."  (June 2008 Order at 40.)

#### b.    The Elements

Minnesota Statute § 325C.01, subd. 3(i) prohibits "acquisition of a trade

secret of another by a person who knows or has reason to know that the trade

secret was acquired by improper means."

#### c.    Existence of a Trade Secret

41

Coyne's has failed to prove existence of a trade secret.

'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 325C.01, subd. 5.  See also Cherne Indus., Inc. v. Grounds & Assocs., Inc., 278

N.W.2d 81, 90 (Minn. 1970).

Coyne's has not shown that the information had economic value.  Coyne's

submits no evidence of the steps it took to maintain confidentiality, beyond the

fact that Enesco signed the NDA.  See RING Computer Sys., Inc. v. ParaData

Computer Networks, Inc., No. C4-90-889, 1990 WL 132615, at *2 (Minn. Ct. App.

Sept. 18, 1990) (holding that "signing of a confidentiality agreement, without

more, is not enough") (citing Electro-Craft Corp. v. Controlled Motion, Inc., 332

N.W.2d 890, 901-02 (Minn. 1983)).  Nor has it identified, with specificity, what the

particular trade secrets are.  See, e.g., SL Montevideo Tech. Inc. v. Eaton

Aerospace, LLC, No. Civ.03-3302 (RHK/FLN), 2006 WL 1472860, at *3 (D. Minn.

May 26, 2006), <u>aff'd</u> 491 F.3d 350 (8th Cir. 2007).

### d. Improper Means

Coyne's has also failed to show that Enesco used improper means to acquire confidential information.  <u>See</u> <u>Widmark v. Northrup King Co.</u>, 530 N.W.2d 588, 592-93 (Minn. Ct. App. 1995) (summary judgment for defendant appropriate when plaintiff did not present "any competent evidence that [the defendant] acquired his list of customers through improper means").  Enesco received the information at issue under the NDA, drafted by Coyne's, which was an arms-length negotiation.  "Where the parties have a contractual relationship that defines the duty of nondisclosure, the contract defines that duty for purposes of misappropriation . . . ."  <u>Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.</u>, 284 F. Supp. 2d 964, 992 (N.D. Ill. 2003) (interpreting Illinois Trade Secrets Act).  Here, there is no evidence that Enesco violated the NDA.

### e. Use

Generally, an action under Minnesota Statute 325C.01, subdivision 3(i) "does not require use or disclosure of the trade secret."  (June 2008 Order at 39.)  However, here, Coyne's does not seek injunctive relief for this claim because all of the information has been returned.  Because it seeks no injunctive relief,

43

Coyne's must show some damage, in order to sustain a claim. However, Coyne's points to no evidence that Enesco used the information for any reason other than consideration of a potential business relationship with Coyne's. Therefore, the claim must be dismissed. See, e.g., Storage Tech. Corp. v. Cisco Sys., Inc., No. Civ. 00-2253 (JNE/JGL), 2003 WL 22231544, at *9-*10 (D. Minn. Sept. 25, 2003) (granting summary judgment when plaintiff identified no loss from alleged misappropriation), aff'd 395 F.3d 921 (8th Cir. 2005). See also Fox Sports Net North, LLC v. Minn. Twins P'ship, 319 F.3d 329, 336 (8th Cir. 2003) (affirming summary judgment when, "[e]ven if [defendant] did know of trade secrets, the record contains no evidence that he used the [information] for [his] benefit").

Because Coyne's fails to meet multiple elements of the Minnesota Trade Secrets Act claim, Enesco is entitled to summary judgment on this claim.

### 8.      Count 10: Violation of the Minnesota Franchise Act

#### a.      The Claim

Coyne's alleges that CA has damaged Coyne's franchise, in violation of the Minnesota Franchise Act, Minn. Stat. § 80C.01, et seq., because "Enesco has assumed Country Artists' roles as franchisor and vendor of the Products subject to the Distributor Agreement and Coyne's rights as franchisee," and has

44

wrongfully terminated the Distributor Agreement, failed to perform its terms, and refused to recognize Coyne's franchise rights.  (Compl. ¶¶ 110-11.)

### b.     The Elements

A franchise is defined by three elements: "1) A right granted to the franchisee to engage in business using the franchiser's trade name or other commercial symbol; 2) a 'community of interest' in the marketing of goods or services between the franchisee and franchiser; and 3) a 'franchise fee' paid by the franchisee."  <u>OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg Ab</u>, 346 N.W.2d 162, 165-66 (Minn. Ct. App. 1984) (citation omitted).  The parties' arguments focus on the last element: the franchise fee.

### c.     Definition of a Franchise Fee

A franchise fee is

any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges . . .

Minn. Stat. § 80C.01, subd. 9.  Certain payments are specifically excluded from

45

this definition.   <u>See</u> Minn. Stat. § 80C.01., subd. 9(a)-(f).

"Not all payments made by a purported franchisee over the course of a business relationship constitute franchise fees."  <u>Sound of Music v. Minn. Mining & Mfg.</u>, 477 F.3d 910, 922 (7th Cir. 2007).  Franchise fees are only those fees paid in exchange for "the 'right' to enter into a business or the 'right' continue a business."  <u>Id.</u> (citing Minn. Stat. § 80C.01, subd. 9).  Ordinary business expenses and reasonable minimum purchase requirements do not constitute franchise fees.  <u>Id.</u>  Also, "the purchase of goods or agreement to purchase goods at a bona fide wholesale price" are not considered a franchise fee.  Minn. Stat. § 80C.01, subd. 9(a).

Enesco points out that § 1.3 of the Distributor Agreement states that no franchise relationship was created.  However, a party cannot waive the Minnesota Franchise Act protections, even with explicit written language.  <u>See</u> Minn. Stat. § 80C.21.

### d.     Genuine Question of Material Fact Regarding Existence of an Indirect Franchise Fee

Coyne's argues that a number of facts combine to create a genuine issue of material fact with regard to the existence of an indirect franchise fee.  First, CA

required Coyne's to pay a 50% markup on product. Second, there was a minimum sales requirement of $5 million or 5% above the previous year's sales, whichever is greater. Third, Coyne's was required to purchase excess inventory through the Share Agreement.

In determining whether a franchise fee exists, "reasonableness" is key. R&A Small Engine, Inc. v. Midwest Stihl, Inc., No. 06-877, 2006 WL 3758292, at *3-*4 (D. Minn. Dec. 20, 2006) (gathering Minnesota cases). Coyne's argues that it is illogical to assume that all of the rights granted to Coyne's under the Distributor Agreement, including the license to use the Trademarks, the limitation on CA's right to compete with Coyne's in the Territory, and CA's obligation to pay a substantial termination fee, are merely in consideration for Coyne's payment of a bona fide wholesale price for CA products. Coyne's also claims that the markup was required in order to do business with CA. Enesco has set forth evidence that Coyne's principals considered the markup to be reasonable and that Coyne's achieved a significant gross profit margin on its sale of CA products.

Standing alone, the markup may be insufficient to constitute a franchise fee; however, Coyne's has also pointed to the minimum sales requirement

imposed by CA.  Minimum volume sales requirements "can constitute an indirect franchise fee if the prices exceeded bona fide wholesale prices or if the distributors were required to purchase amounts or items that they would not purchase otherwise."  Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 242 (Minn. Ct. App. 1998) (citations omitted).

Additionally, Coyne's points to the inventory purchased through the Share Agreement.  In some cases, "investments in excess inventory may constitute an indirect franchise fee.  If, for example, the excess inventory were not liquid or were such that the franchisor could prevent it from being liquid (perhaps by preventing the franchise from claiming it is an authorized dealer), the excess inventory might be a franchise fee."  Wright-Moore Corp. v. Ricoh Corp., 908 F.2d 128, 136 (7th Cir. 1990).  Here, Coyne's presents evidence that the quantity of inventory in the Share Agreement was unreasonably large and illiquid.  According to Coyne's, it needed heavy discounts to sell the inventory and some of it was not suitable for sale by Coyne's.  On the other hand, Coyne's did sell all of the inventory within a year, and the Share Agreement was a one-time agreement.

Both parties present cogent arguments for whether the CA-Coyne's

relationship included an indirect franchise fee and, thus, constituted a franchise relationship. At this summary judgment stage, it is not the Court's place to decide which argument is stronger. There is a genuine issue of material fact regarding the existence of an indirect franchise fee, which will be addressed at trial.

### 9.    Count 11: Unfair or Inequitable Practice

Coyne's asserts that Enesco violated Minn. Stat. § 80C.14 which makes it an "unfair and inequitable practice" for "any person" to "compete with the franchisee in an exclusive territory." Minn. R. 2860.4400(C). Coyne's asserts that it is an exclusive distributor of CA. Coyne's alleges that Enesco, with knowledge of Coyne's exclusive rights, notified customers and the relevant market segment that it would be immediately selling CA products in Coyne's exclusive territory.

Because the Court holds that there is a genuine question of material fact regarding whether Coyne's is a franchisee, it denies summary judgment on Count 11.

### 10.    Request for Partial Summary Judgment on Certain Damages Claims

The Court has granted summary judgment for Enesco on all counts, save

the franchise claims.  Therefore, the Court need not reach Enesco's request for partial summary judgment on the non-franchise claims based on Coyne's alleged failure to prove damages.

As for the franchise claims, the Minnesota Franchise Act limits a party's right to terminate or cancel a franchise agreement.  Minn. Stat.  § 80C.14, subd. 3. There are genuine issues of material fact for the jury regarding the extent of damages recoverable, if any, on the franchise claims.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.  Defendant Enesco, LLC's  Motion to Strike the Declaration of Arthur H. Cobb [Docket No. 167] is **DENIED**.

2.   Defendant Enesco, LLC's Motion to Exclude Arthur Cobb's Opinion and Testimony from the Trial of this Matter [Docket No. 132] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion is denied, with the exception that any testimony by Cobb regarding loss of goodwill and development costs is excluded.

3.  Plaintiff's Motion for Partial Summary Judgment [Docket No. 128] is **DENIED**.

4.  Defendant Enesco, LLC's Motion for Summary Judgment [Docket No. 130] is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.  The following Counts are **DISMISSED WITH PREJUDICE**: Count 1: Interference with Contractual Relations; Count 2:

Interference with Prospective Relations; Count 3: Promissory Estoppel; Count 5: Federal Unfair Competition in Violation of the Lanham Act § 43, 15 U.S.C. § 1125(a); Count 7: Violation of Minn. Stat. § 325D.44, Deceptive Trade Practices; and Count 8: Violation of Minn. Stat. § 325C.01, Misappropriation of Trade Secrets.

b. The following Counts **REMAIN**: Count 10: Violation of the Minnesota Franchise Act and Count 11, Unfair or Inequitable Practice in Violation of Minn. Stat. § 80C.14.

Dated:  August 16, 2010                    s/ Michael J. Davis_____
                                           Michael J. Davis
                                           Chief Judge
                                           United States District Court